**CLAY TOWER APARTMENTS, an Oregon general partnership comprised of Harold J. Schnitzer, Arlene Schnitzer, and Harsch Investment Corp., Plaintiff,**

v.

**Jack KEMP, in his official capacity as Secretary of the United States Department of Housing and Urban Development; and The United States Department of Housing and Urban Development, Defendants.**

Civ. No. 90–989–FR.

United States District Court, D. Oregon.

March 4, 1991.

---

Kenneth M. Novack, Richard H. Allan, Ball, Janik & Novack, Portland, Or., for plaintiff.

Charles H. Turner, U.S. Atty., Riley J. Atkins, Asst. U.S. Atty., Portland, Or., for defendants.

## OPINION

FRYE, District Judge:

The matters before the court are the cross-motions for summary judgment of the parties (# 8 and # 18).

## FACTS

Plaintiff, Clay Tower Apartments, an Oregon general partnership comprised of Harold J. Schnitzer, Arlene Schnitzer, and Harsch Investment Corp., owns the Clay Tower Apartments (Clay Towers), a multifamily housing project at 1430 S.W. 12th Avenue, Portland, Oregon. Construction of Clay Towers was financed by the Housing Division of the Department of Commerce of the State of Oregon (now known as the Oregon Housing Agency). The Oregon Housing Agency (the OHA) was designated as a housing financing agency under Section 8 of the United States Housing Act of 1937, as enacted by the Housing and Community Development Act of 1974 (hereinafter referred to as the Section 8 Program).

In September, 1978, the OHA, as the mortgagee, agreed with Clay Towers to enter into a Housing Assistance Payments Contract (HAP Contract) when Clay Towers was completed. On December 11, 1979, the OHA and Clay Towers entered into the HAP Contract. The HAP Contract was approved by the United States of America acting through the Department of Housing and Urban Development (HUD). In the HAP Contract, the OHA and Clay Towers agreed upon the maximum rents for tenants of Clay Towers and agreed that any rent increases must first be approved by the OHA.

Prior to the beginning of the construction of Clay Towers, the owner of the real property applied for and was granted a ten-year exemption from real property taxes on the improvements to the real property by the City of Portland, Ordinance No. 142948. The budget that Clay Towers prepared in support of the application to the OHA for the permanent loan reflects the real property tax exemption.

On April 25, 1978, Jack Wood, Director of the Housing Development Division of HUD, wrote to Gregg Smith, Administrator of the OHA, as follows:

Your staff expressed concern to HUD regarding what will happen to the rents when [Clay Towers] is placed on the tax rolls after the 10 year tax abatement period runs out.

All we have at this time are the instructions in the Federal Register dated April 15, 1975, which is Appendix 5 of the Section 8 Housing Assistance Payments Program Housing Finance and Development Agencies Processing Handbook, 7420.4. See paragraph number 883.207, Rent Adjustments, (c) and (d). They are as follows:

(c) Special Additional Adjustments. Special additional adjustments may be granted, when approved by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract units which have resulted from substantial *general* increases in real property taxes ... but only if and to the extent that the Own-

er or the HFA clearly demonstrates that such *general* increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner or the HFA shall submit to HUD financial statements which clearly support the increase.

(d) Overall Limitation. Notwithstanding any other provisions of this Part, adjustments as provided in this section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the HFA (and approved by HUD, in the case of adjustments under paragraph (c) of this section).

We trust that this is sufficient to answer your concerns.

Exhibit B to Plaintiff's Supplemental Statement of Material Facts (emphasis added).

The property tax exemption afforded to Clay Towers by the City of Portland expired on June 30, 1990. When the property tax exemption expired, the net assessed value for Clay Towers increased from $600,000 to $9,343,800 for the 1990–1991 tax year. The real property taxes for Clay Towers for the 1990–1991 tax year are $313,062.15. Clay Towers applied to the OHA for permission to increase the rents to compensate for the increase in real property taxes.

The HAP Contract between the OHA and Clay Towers has two provisions for adjustments in the maximum monthly rents for Section 8 units as set forth in 42 U.S.C. § 1437f(c)(2). Section 1437f(c)(2)(A) of the HAP Contract provides for at least annual adjustments "to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula." This automatic annual adjustment factor applies to all Section 8 assisted housing projects in the primary metropolitan statistical area, and is calculated to compensate for annual increases in the cost of maintaining a housing project, including the payment of full real property taxes. The Clay Tower Project has received the automatic annual adjustments each year from 1980 to 1990 under this provision, despite the fact that the improvements to the real property were not taxed for the ten-year period.

The second adjustment mechanism, and the one Clay Towers relies upon in this case, provides as follows:

> The contract shall further provide for the Secretary to make additional adjustments in the maximum monthly rent for units under contract to the extent he determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes ... which are not adequately compensated for by the adjustment in the maximum monthly rent authorized by subparagraph (A).

42 U.S.C. § 1437f(c)(2)(B), adopted verbatim as 24 C.F.R. § 883.710(b). The OHA submitted the request of Clay Towers for a rent increase to HUD. On June 25, 1990, HUD denied the request of Clay Towers for a rent increase with this response:

> This is in response to your June 5, 1990, request for a special adjustment to the rents at Clay Tower resulting from the expiration of the 10–year tax abatement by the City of Portland. We are unable to grant your request because expiration of the abatement is not a "general increase in real property taxes ...." (24 CFR 883.710).
>
> It was not necessary for you to submit this request to us, since the decision regarding its eligibility should have been made in your office pursuant with your responsibility under the Annual Contributions Contract.
>
> We suggest, if you have not already done so, that you look at the Amortization Schedule for Clay Tower to see if the abatement cancellation is reflected by an adjustment in the debt service. We found this to be true for our insured properties with similar tax abatements.

Exhibit I to Plaintiff's Statement of Material Facts.

Clay Towers thereafter filed this action for declaratory relief seeking a declaration that the contractual, regulatory and statutory provisions applicable to a special rent adjustment entitle Clay Towers to a rent adjustment, and the denial by HUD of the request of Clay Towers for a special rent adjustment is clearly erroneous.

## CONTENTIONS OF THE PARTIES

Clay Towers argues that the conclusion of HUD—that is, that the tax increase that Clay Towers must pay is not the result of a "general increase" in the real property assessment within the meaning of 42 U.S.C. § 1437f(c)(2)(B)—conflicts with the underlying purpose of the statutory right to a rent adjustment. Clay Towers recognizes that the interpretation of an agency's regulatory and statutory provisions is generally entitled to deference, but argues that the interpretation of HUD in this case is inconsistent with the intent of Congress.

Clay Towers argues that the intent of Congress in making provision for rent adjustments was to allow for rent increases which are necessary and are not out of line with those for comparable housing projects. Clay Towers explains that the tax increase at issue is not a result of bad management and will only bring Clay Towers into line with the operating expenses incurred by other facilities of a comparable nature. Clay Towers contends that HUD's interpretation of 42 U.S.C. § 1437f(c)(2)(B) leaves Clay Towers uncompensated for the expenses of operation that are necessarily incurred and, therefore, HUD's interpretation is plainly erroneous and an abuse of discretion.

HUD responds that the expiration of the tax abatement does not qualify as a substantial "general increase" in real property taxes; that to grant the owners of Clay Towers the adjustment they request will be to ignore the term "general" in 42 U.S.C. § 1437f(c)(2)(B) and will require HUD to pay for any substantial increase in the property taxes of a project which are caused by an upward assessment for any special reason; that 42 U.S.C. § 1437f(c)(2)(B) does not require HUD to pay these taxes because Clay Towers made no provision for an entirely forseeable day—the day when Clay Towers would be placed on the property tax rolls; that Clay Towers has received full annual increases under section (A) during each of the years of its operation, including increases reflecting the necessary expenses of owning and operating real property, despite a property tax abatement with regard to the improvements to its own property; and that HUD is not financially responsible for the failure of the owners of Clay Towers to set aside funds from the automatic annual rental increases under section (A) designed to offset, in part, increasing expenditures for property taxes.

HUD explains that the failure of Clay Towers to adequately plan for the forseeable increase in expenditures resulting from Clay Towers being placed on the property tax rolls in 1990 was imprudent, and HUD's denial of a rent adjustment under 42 U.S.C. § 1437f(c)(2)(B) is not arbitrary and capricious.

In reply, Clay Towers asserts that HUD took a position contrary to the position it takes in this case in a letter from HUD to the OHA dated April 25, 1978. Clay Towers contends that by citing to the regulatory provisions for special additional rent adjustments and by remarking that "[w]e trust that this is sufficient to answer your concerns," HUD was admitting that the regulation applies to the circumstances of this case.

HUD responds that the letter dated April 25, 1978 refers the OHA only to the regulation, stating that the handbook was "[a]ll we have at this time." HUD argues that this reference could not have been a commitment by HUD to a future course of action.

## STANDARD OF REVIEW

■ A court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The scope of review under the arbitrary and capricious standard is very narrow. A court may not substitute its judgment for that of

the agency.  *Sierra Pac. Indus. v. Lyng,* 866 F.2d 1099 (9th Cir.1989).

## ANALYSIS AND RULING

This court can only disturb the decision of HUD if it finds that the decision was arbitrary and capricious or not in accordance with law.  The court finds that it was reasonable and in accordance with the law for HUD to conclude that the term "substantial *general* increases" does not apply to the expiration of a one-time, ten-year tax exemption.  To conclude otherwise would read the word "general" out of the regulation.  The letter of April 25, 1978 makes the case more sympathetic for Clay Towers, but does not rise to an estoppel or a binding commitment on the part of HUD.

The motion of Clay Towers for summary judgment (# 8) is denied.  The motion of HUD for summary judgment (# 18) is granted.  A judgment will be entered in favor of defendants.