978 F.2d 478
 CLAY TOWER APARTMENTS, Oregon general partnership, Plaintiff-Appellant,
and
Harold Schnitzer, et al., Plaintiff,
v.
Jack KEMP, Sec. HUD, Secretary of U.S. Department of Housing
& Urban Development, et al., Defendant-Appellee.
 No. 91-35370.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 19, 1992.
Decided Oct. 14, 1992.
 
 Jacob Tanzer, Ball, Janik & Novack, Portland, Or., for plaintiff-appellant.
 Jeffrica Jenkins Lee, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before: WRIGHT, BEEZER, and LEAVY, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 An Oregon owner of low-income housing brought a declaratory judgment action against the United States Department of Housing & Urban Development [HUD] challenging HUD's determination that the expiration of a ten-year real property tax abatement on a "Section 8" housing project was not a basis for a special rent adjustment under 42 U.S.C. § 1437f(c)(2)(B) (1988). The partnership appeals the district court's grant of summary judgment in HUD's favor. We reverse and remand.
 
 
 2
 * In 1980, Clay Tower Apartments, an Oregon general partnership, finished construction on a housing project for low-income elderly people. Clay Tower Apartments v. Kemp, 757 F.Supp. 1145, 1146 (D.Or.1991). The partnership financed the construction through what is now known as the Oregon Housing Agency [OHA]. The financing proceeded under Section 8 of the United States Housing Act of 1937, as amended by § 201(a) of the Housing and Community Development Act of 1974, Pub.L. No. 93-383, 88 Stat. 653 (codified at 42 U.S.C. §§ 1437 to 1440).
 
 
 3
 Pursuant to the Section 8 Program, OHA and the partnership entered into a Section 8 Housing Assistance Payments [HAP] contract.[1] Under a HAP contract, the owner collects a portion of the "contract rent" directly from the tenants while the remainder is paid to the owner by HUD through the contract administrator, OHA. See Rainier View Assocs. v. United States ex rel. U.S. Dep't Hous. & Urban Dev., 848 F.2d 988, 989 (9th Cir.1988) (per curiam) (explaining the Section 8 Program), cert. denied, 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989).
 
 
 4
 Before construction began, the City of Portland granted the project a real property tax exemption. Clay Tower, 757 F.Supp. at 1146. Under the terms of the exemption, the city assessed taxes against the underlying land and abated taxes assessed against improvements for ten years.
 
 
 5
 Both the partnership and OHA questioned what would happen to the contract rents when the abatement expired. In April 1978, HUD's housing development director responded in a letter to OHA's administrator. The letter cited the regulation for special additional adjustments to contract rent and concluded "[w]e trust that this is sufficient to answer your concerns." Clay Tower, 757 F.Supp. at 1146-47.
 
 
 6
 The parties forged ahead. OHA and the partnership entered into an HAP contract which HUD subsequently approved. Clay Tower, 757 F.Supp. at 1146. The underlying financial analysis included under "Total Annual Expense" a line for taxes. The figure "10,000" was typed on that line. No mention was made of the tax abatement; no mention was made of future tax obligations.
 
 
 7
 As required by the Section 8 Program, the HAP contract set forth the initial contract rent and included two mechanisms for its increase. Clay Tower, 757 F.Supp. at 1147. First, under the mandate of section 1437f(c)(2)(A), the contract provided "automatic annual adjustments" to reflect changes in area-wide expenses, including increases in full real property tax. Each year from 1980 through 1990, Clay Tower's contract rents increased by the full percentage allowed under the applicable Automatic Annual Adjustment Factor. Id.
 
 
 8
 Second, carrying out the mandate of section 1437f(c)(2)(B), the contract permitted special "additional adjustments." Id. These compensate for "substantial general increases in real property taxes, utility rates, or similar costs which are not adequately compensated for by the adjustment" authorized by the first provision. 42 U.S.C. § 1437f(c)(2)(B).
 
 
 9
 In 1980, construction ceased, and the tax abatement period began. The completed, seventeen-story building included 233 one-bedroom apartments reserved for low-income tenants. In 1990, anticipating the end of the tax abatement period, Clay Tower applied to OHA for a special additional adjustment in the contract rent to compensate for the expected, substantial tax increase. Clay Tower, 757 F.Supp. at 1147. OHA forwarded the request to HUD; HUD denied the request, stating that the expiration of the abatement was not a general increase in real property taxes.[2]
 
 
 10
 On June 30, 1990, the property tax exemption expired. Multnomah County's tax statement reflects that Clay Tower's net assessed value increased from $600,000 to $9,343,800. The real property taxes increased accordingly, from $19,937 to $313,062.
 
 
 11
 The partnership sued for declaratory relief. In a published opinion, the district court upheld HUD's statutory interpretation and entered summary judgment in HUD's favor. Clay Tower, 757 F.Supp. at 1149. The partnership timely appealed; we have jurisdiction.[3]
 
 II
 
 12
 We review the district court's grant of summary judgment de novo. Jones v. Union Pacific R.R., 968 F.2d 937, 940 (9th Cir.1992). We use federal law to interpret a government contract. Saavedra v. Donovan, 700 F.2d 496, 498 (9th Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983). "When, as here, the district court's decision is based on analysis of the contract language, the decision is reviewed de novo." Rainier View, 848 F.2d at 990 (citation omitted).
 
 
 13
 Although the contract signed by the parties contains the same language as 42 U.S.C. § 1437f(c)(2)(B), this case does not stand on mere agency interpretation. The existence of the contract changes the nature of our review. Section 1437f(c)(2)(B) notwithstanding, the parties executed a contract, and our inquiry focuses on the contractual requirements. This focus does not demand deference to HUD's statutory interpretation.
 
 
 14
 We review de novo principles of contract interpretation as applied to the facts. United States v. Plummer, 941 F.2d 799, 803 (9th Cir.1991). The agency argues that, by its plain meaning, the contract excludes Clay Tower's increase. HUD contends that the word "general" signals Congress' intent to authorize additional adjustments in maximum rents only when real estate taxes of all similarly situated property owners in a given locale increase substantially. HUD says that if a local municipality doubled real estate taxes, that might be a "general" increase not accounted for by the automatic adjustment because the automatic adjustment generally has a more regional focus.[4]
 
 
 15
 The partnership says that, even under the government's definition, its tax increase qualifies as "general." Unlike a true site-specific tax increase, it occurred by operation of a state statute that necessarily applies equally and uniformly to similarly situated properties. The category of similarly situated properties includes those properties granted temporary tax abatements under the authority of that statute. The increase is "general" because it applies to any project receiving the ten-year exemption.
 
 
 16
 The partnership argues that the increase qualifies as "general" for two other reasons. First, it is permanent. Clay Tower will be subject to the higher tax as long as the apartment building exists. Second, it brings Clay Tower's tax base into line with that for most other developed properties. Its taxes will be based on the assessed value of both the land and improvements.
 
 
 17
 We hold that the contract unambiguously supports Clay Tower's interpretation. HUD entered into the Annual Contributions Contract with the partnership knowing that the project's tax exemption would expire after ten years. This inevitable tax increase was not a result of a unique rise in property value; nor was it a result of bad management. In fact, the exemption reduced the operating costs of the subsidized low-income housing for ten years. HUD was the direct beneficiary of reduced real property taxes.
 
 
 18
 The ten-year property tax abatement expired by operation of a state statute. See Or.Rev.Stat. § 307.630. The statute applies uniformly to all similarly situated properties. "[A] law is general when it operates equally and uniformly upon all persons, places, or things brought within the relation and circumstances for which it provided." Farrell v. Port of Columbia, 50 Or. 169, 91 P. 546, 547 (1907). The increase in property taxes for Clay Tower Apartments was "general."
 
 
 19
 Claims for attorneys' fees on appeal pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), shall be considered by the district court. The partnership shall recover costs on appeal.
 
 
 20
 We REVERSE the district court's grant of summary judgment to HUD and REMAND for entry of declaratory relief in favor of the partnership.
 
 
 
 [1]
 The initial term of the contract was five years. Four optional additional terms of five years each and one additional term of three years are possible under the contract
 
 
 [2]
 The entire denial read:
 This is in response to your June 5, 1990, request for a special adjustment to the rents at Clay Tower resulting from the expiration of the 10-year tax abatement by the City of Portland. We are unable to grant your request because expiration of the abatement is not a "general increase in real property taxes ..." (24 CFR 883.710).
 It was not necessary for you to submit this request to us, since the decision regarding its eligibility should have been made in your office pursuant with your responsibility under the Annual Contributions Contract.
 We suggest, if you have not already done so, that you look at the Amortization Schedule for Clay Tower to see if the abatement cancellation is reflected by an adjustment in the debt service. We found this to be true for our insured properties with similar tax abatements.
 Clay Tower, 757 F.Supp. at 1147 (emphasis added).
 
 
 [3]
 Alpine Ridge Group v. Kemp, 955 F.2d 1382, 1385 (9th Cir.1992). See generally Rainier View, 848 F.2d 988 (9th Cir.1988); Sheridan Square Partnership v. United States ex rel. U.S. Dep't of Hous. & Urban Dev., 761 F.Supp. 738, 741 (D.Colo.1991)
 
 
 [4]
 HUD also points to cases which interpret the phrase "general rate increases" as used in the Staggers Rail Act, 49 U.S.C. § 11501(b)(6). For example, in Texas v. United States, the Fifth Circuit defined it to mean "those [increases] that ... apply nationally or throughout broad regions of the country." 730 F.2d 339, 346 n. 11 (5th Cir.), cert. denied 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984)
 The partnership effectively establishes the irrelevancy of this interpretation. First, the Section 8 Program predates the Rail Act. Interpretations of the latter are therefore of marginal value in determining what was meant when the former was passed.
 Second, applying the Rail Act interpretation here makes little sense. Subsection A, the automatic adjustment provision, compensates for national and regional increases. If subsection B had the same scope, it would be a redundancy. Third, even HUD does not adopt this interpretation. It reads "general" to refer to "a given locale," such as a municipality, rather than the nation or a broad region.