**WESTLANDS WATER DISTRICT
and San Benito Water
District, Plaintiffs,**

v.

**Roger K. PATTERSON, Regional Director, Mid–Pacific Region, United States of America, Department of the Interior, Bureau of Reclamation; Bruce Babbit, Secretary of the Interior, Defendants.**

**Friant Water Users Authority, et al., Intervenors.**

**San Joaquin River Exchange Contractors Water Authority, et al., Intervenors.**

**No. CV–F–94–5217 OWW.**

United States District Court, E.D. California, Fresno Division.

Aug. 9, 1995.

**1308**

Michael Victor Sexton, Minasian Minasian Minasian Spruance Baber Meith and Soares, Oroville, CA.

Gregory K. Wilkinson, Best Best and Krieger, Riverside, CA.

Denslow B. Green, Green Green and Rigby, Madera, CA.

Thomas William Birmingham, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA.

Maria A. Iizuka, U.S. Department of Justice, Land and Natural Resources Division, Sacramento, CA.

MEMORANDUM OPINION AND ORDER RE: PLAINTIFFS' MOTION FOR VOLUNTARY DISMISSAL WITHOUT PREJUDICE, DEFENDANTS' AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT

WANGER, District Judge.

### I. Introduction

Plaintiffs Westlands Water District ("Westlands") and San Benito County Water District ("San Benito, collectively "the Districts") move to dismiss their Complaint without prejudice, pursuant to Fed.R.Civ.P. 41(a)(2). The motion is opposed by the Federal Defendants, the Exchange Contractors,[1] and the Friant Intervenors.[2] The Federal Defendants, the Exchange Contractors, and the Friant Intervenors move for summary judgment. The Exchange Contractors, the Madera Irrigation District, and the Chowchilla Water District join in the motions of the Federal Defendants and of the Friant Intervenors. The Districts oppose the summary judgment motions. At the hearing on the motions, all parties were granted the opportunity to submit additional legal argument in support of or in opposition to the motions for summary judgment. The additional briefing has been received and considered.

### II. Background

#### A. Procedural History

In 1992, the Districts sued the same defendants seeking injunctive and declaratory relief, challenging Central Valley Project ("CVP") water allocations made by the Bureau of Reclamation ("Bureau") for 1992, a short[3] water year. The same intervenors in this case intervened in the 1992 action. Defendants' motion to dismiss the complaint and for judgment on the pleadings was granted on the ground that the Bureau has authority to divert water from the San Luis Reservoir for the use of the Exchange Contractors, even to the detriment of the plaintiffs, and the Bureau's 1992 water allocation to the Districts was not arbitrary or capricious. *Westlands Water District v. United*

---

1. The San Joaquin River Exchange Contractors are the Columbia Canal Company, San Luis Canal Company, Central California Irrigation District, and Firebaugh Canal Water District. For ease of reference, the Friant Power Authority is also included in this group, because they are represented by the same counsel. The Friant Power Authority is formed by the Chowchilla Water District, Madera Irrigation District, Orange Cove Irrigation District, Lindsay–Strathmore Irrigation District, Lindmore Irrigation District, Terra Bella Irrigation District, Delano–Earlimart Irrigation District, and Southern San Joaquin Municipal Utility District.

2. The Friant Users Authority is a joint powers agency consisting of 25 irrigation and water districts organized under California law, and is responsible for maintaining the Friant–Kern Canal. The "Friant Intervenors" are three intervening districts: (1) Orange Cove Irrigation District; (2) Shafter–Wasco Irrigation District; and (3) Terra Bella Irrigation District.

3. Not in time, but in the amount of available federal water to meet the Bureau's contractual commitments to CVP water contractors.

States Dep't of Interior ("Westlands I"), 805 F.Supp. 1503, 1513 (E.D.Cal.1992). The Ninth Circuit affirmed the decision, although the appellate court did not agree with the analysis of underlying water-law issues. Westlands Water Dist. v. Firebaugh Canal ("Westlands I—Appeal"), 10 F.3d 667, 677 (9th Cir.1993).

This case was filed after the Bureau announced CVP water allocations for the 1994 water year, another short water year.[4] Plaintiffs were granted 35% of their contractual entitlement, and the Exchange Contractors were granted 75% of their entitlement.[5] Plaintiffs allege that the Federal Defendants breached contractual obligations in apportioning water in shortage years. Plaintiffs complaint seeks the following relief:

*First:* Injunctive relief, based on the allegation that the Bureau's 1994 allocations are contrary to the provisions of the Westlands and San Benito water service contracts, and plaintiffs have no plain, speedy and adequate remedy at law;

*Second:* Declaratory relief, based on Article 11 of the Westlands contract, which obligates the Bureau to apportion water among those entitled to receive water from the San Luis Unit;

*Third:* Declaratory relief, based on Article 7(b) of the San Benito contract, which obligates the Bureau to apportion available water among water users, subject to prohibitions in existing contracts, CVP authorizations or a determination that some other method of apportionment is required to prevent undue hardship.

Plaintiffs moved to preliminarily enjoin the Federal Defendants from implementing the 1994 water allocation plan and to require the Bureau to reduce water deliveries by the same percentage among the Exchange Contractors and other agricultural water contractors capable of receiving water from the facilities of the Delta Division, the West San Joaquin Division, and the San Felipe Division of the Central Valley Project. That motion was denied, because plaintiffs did not demonstrate a likelihood of success on the merits of their Complaint; the balance of hardships favored defendants and intervenors, rather than plaintiffs; and the public interest did not favor a preliminary injunction. Westlands Water Dist. v. Patterson ("Westlands III"), 864 F.Supp. 1536, 1551 (E.D.Cal.1994).

The Scheduling Conference Order, filed September 2, 1994, established a final discovery cut-off date of March 3, 1995, and a dispositive motion deadline of April 3, 1995. All parties participated through the appearance of counsel at the scheduling conference and expressed positions in their scheduling conference statements, which afforded the basis for the Case Management Order adopted for the case.

According to the Districts,

> after reviewing the court's written decision [on the motion for preliminary injunction], which was served by United States mail six days before the Scheduling Conference, the Districts determined that they did not wish to pursue this matter and therefore did not proceed with discovery.

(Districts' Consolidated Opposition 17:12–15.) The Federal Defendants and defendants-in-intervention agree that no discovery has been conducted by the Districts.

Although plaintiffs' decision not to pursue this case was apparently made in early September, 1994, the Court was not notified. It was not until December 23, 1994, that the Districts voluntarily moved to dismiss the case without prejudice. The only explanation given for this three-and-a-half-month delay is that plaintiffs sought to proceed by stipulation under Fed.R.Civ.P. 41(a)(1), but the Federal Defendants and defendants-in-intervention would not agree to a dismissal without prejudice.

---

4. The Districts also filed suit in 1993, a short water year, challenging the Bureau's 1993 CVP water allocations and implementation of the CVPIA. *See Westlands Water District v. United States ("Westlands II"),* 850 F.Supp. 1388 (E.D.Cal.1994).

5. On March 14, 1994, the Bureau announced that it could provide the Exchange Contracts with 100% of their contractual supply.

## B. Factual History

The historical background has been summarized in the published decisions concerning these parties and the disputed contracts. See *O'Neill v. United States*, 50 F.3d 677, 680–82 (9th Cir.1995) (affirming in part district court's denial of plaintiffs' motion to enforce a stipulated judgment on the 1963 water service contract with Westlands); *Westlands I*, 805 F.Supp. at 1504–05; *Westlands I—Appeal*, 10 F.3d at 669–70; *Westlands III*, 864 F.Supp. at 1538–39.

In the mid–1930's, the Bureau sought to expand the CVP into the Kern County area of the southern San Joaquin Valley. The Friant Dam was constructed to divert the upper reaches of the San Joaquin River into the Friant–Kern Canal and the Madera Canal. The Exchange Contractors, or their predecessors-in-interest, held vested rights to water in the upper San Joaquin River. The Bureau could not implement the CVP expansion unless it acquired these water rights. To acquire the water rights, the United States and the Exchange Contractors entered into two contracts in July of 1939: the Purchase Contract and the Exchange Contract.

Under the Purchase Contract, the Exchange Contractors sold all of their rights to water from the upper San Joaquin River to the United States, except for "reserved water," water to which the Exchange Contractors held vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their rights to reserved water, as long as they received substitute water from the Federal Delta–Mendota Canal, or other sources that delivered to the Mendota Pool. An amended contract, dated September 15, 1967, is based on these 1939 Purchase and Exchange Contracts. As amended, the Exchange Contract

guarantees the Exchange Contractors the delivery of a minimum of 75% of their full allotment.[6] By these contracts, the Bureau obtained the water rights necessary to implement the southern expansion of the CVP, and the Exchange Contractors transferred their water rights to protect their interest in a reliable water supply.

The water obtained from the Exchange Contractors through the Purchase and Exchange Contracts flows into Millerton Lake. Millerton Lake was formed when the Friant Dam was completed in 1942. It provides water to both the Madera Canal and the Friant–Kern Canal. In the 1940's, the Bureau entered into contracts with the water districts within the Friant Division. Friant Division agricultural water contractors—including the Friant Intervenors—receive water from both the Madera and Friant–Kern Canals.

The San Luis Unit of the CVP was authorized by the San Luis Act in 1960.[7] It consists of the San Luis Dam, the San Luis Reservoir, and a number of smaller facilities. The Bureau constructed the San Luis Reservoir to provide water to Merced, Fresno, and Kings Counties, and to store surplus water from the Sacramento–San Joaquin Delta. The excess capacity of the Delta–Mendota Canal is used to carry water along the west side of the San Joaquin Valley for use in the San Luis Unit and the San Luis Reservoir.[8]

To implement the San Luis Act, the Bureau entered into water service contracts, to provide water to agricultural contractors in the area of the San Luis Unit, including Westlands and San Benito. The Westlands water service contract was executed in 1963. The San Benito water service contract was executed in 1978.

---

**6.** When inflow to the Shasta Reservoir is greater than 3,200,000 acre-feet, the Exchange Contractors receive their full allotment: 840,000 acre-feet. When inflow is less than this amount, the Exchange Contractors receive 650,000 acre-feet, approximately 75% of their full allotment.

**7.** Pub.L. No. 86–488, 74 Stat. 156 (1960).

**8.** The Delta–Mendota Canal pre-dates the San Luis Unit and is the canal from which the Exchange Contractors have received their substitute

water since before the creation of the San Luis Unit. The Comprehensive Plan for the San Luis Unit stated, "The water supply for [the San Luis R]eservoir would be secured almost entirely by pumping through the Delta Mendota [C]anal *at such times as the full capacity of that canal is not required for initial Central Valley Project Needs.*" Friant Intervenors' Statement of Undisputed Facts ¶ 10 (emphasis added); Districts' Separate Statement of Facts ¶ 10 (uncontested that this accurately quotes the Comprehensive Plan).

## III. The Districts' Motion to Dismiss

### A. Standards for Dismissal

■ Rule 41 allows a plaintiff, with the approval of the court, to dismiss an action without prejudice at any time:

> Except as provided in paragraph (1) of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.

Fed.R.Civ.P. 41(a)(2). The decision to grant a motion for voluntary dismissal is discretionary. *Stevedoring Servs. of Am. v. Armilla Int'l*, 889 F.2d 919, 921 (9th Cir.1989).

■ A motion for voluntary dismissal should be granted unless the defendant can show that it will suffer some plain legal prejudice as a result. *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987); *Hamilton v. Firestone Tire & Rubber Co.*, 679 F.2d 143, 145 (9th Cir.1982). Plain legal prejudice may be shown where actual legal rights are threatened or where monetary or other burdens appear to be extreme or unreasonable. *Watson v. Clark*, 716 F.Supp. 1354, 1356 (D.Nev.1989), *aff'd*, 909 F.2d 1490 (9th Cir.1990). Factors to consider in determining legal prejudice are:

(1) The defendant's effort and expense involved in preparing for trial;

(2) Excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action;

(3) Insufficient explanation of the need to take a dismissal; and

(4) The fact that defendant has moved for summary judgment.

*Paulucci v. City of Duluth*, 826 F.2d 780, 783 (8th Cir.1987); *see also, Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir.1994); *United States v. Outboard Marine Corp.*, 789 F.2d 497, 502 (7th Cir.), *cert. denied*, 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986). The prejudice resulting from uncertainty over title to land is also a valid consideration. *Ferguson v. Eakle*, 492 F.2d 26, 29 (3d Cir. 1974). Plain legal prejudice does not occur where the defendant merely faces the threat of a second lawsuit or a tactical disadvantage. *Hamilton*, 679 F.2d at 145.

■ A suit may be dismissed with or without prejudice, and the dismissal may be conditioned on terms that are proper or necessary to avoid prejudice to the defendant. *See Koch v. Hankins*, 8 F.3d 650, 652 (9th Cir.1993).

### B. Discussion

■ Plaintiffs assert voluntary dismissal will not result in legal prejudice to defendants beyond the threat of a second lawsuit or the inconvenience of a lack of a legal ruling. Defendants respond that the legal prejudice they will suffer from a dismissal without prejudice is the uncertainty of their water rights. Defendants in *Paulucci v. City of Duluth* presented a similar argument of uncertainty over land title.

In *Paulucci*, the City of Duluth condemned plaintiff's property so Lake Superior Paper Industries ("LSPI") could erect a paper mill. *Paulucci*, 826 F.2d at 781. The plaintiffs brought simultaneous state and federal actions against the City and LSPI based on an improper taking. *Id.* After the state action was decided in favor of the defendants, the plaintiffs sought to voluntarily dismiss the federal action under Rule 41(a)(2). *Id.* The district court denied plaintiff's motion for dismissal and granted defendant's motion for summary judgment. *Id.* at 782. The plaintiffs appealed and the Eighth Circuit affirmed. *Id.* The Eighth Circuit noted that millions of dollars had been invested in the plant, and found "future litigation asserting this claim would generate uncertainty about the title to the land and possibly jeopardize the development of the project." *Id.* at 783.

Uncertainty over water rights creates a similar risk for the defendants-in-intervention. John E. Boudreau, Manager of the Friant Power Authority, avers that uncertainty over water rights could jeopardize the ongoing negotiations to refinance the Friant Power Project and put the financial viability of the Project at risk. This uncertainty also affects short and long-term investment used by defendants in operating their businesses. The Declaration of Stephen W. Kritscher (Exchange Contractors' Opposition, Exh. A), an investment banker, describes the deterrent for long-term agricultural investment created by this uncertainty. The Declaration of Michael Porter (Exchange Contractors'

Opposition, Exh. B), Engineer/Manager of Central California Irrigation District, asserts local investors and lenders are already balking at the uncertainty of water allocations. This continued uncertainty for all CVP water users constitutes the type of prejudice that weighs against dismissal without prejudice.

Other factors also support denial of dismissal without prejudice. After a preliminary injunction hearing at which extensive evidence and legal briefing was submitted, the Districts have failed to conduct any discovery in this matter, suggesting that the case is ripe for judicial determination. This delay is excessive, in light of opposing parties' contentions that no discovery was necessary. Plaintiffs have not been diligent in prosecuting the case. They did not notify the Court of their alleged loss of interest in the case until over half way through the time reserved for pretrial discovery.

The defendants-in-intervention have incurred substantial expense in defense of this suit. (*See, e.g.,* Declaration of Richard M. Moss (engineer's fees in the amount of $8,078.50); Declaration of Scott K. Kuney (attorney's fees in the amount of $8,473.95); Declaration of Gregory K. Wilkinson (attorney's fees in the amount of $68,147.50); Declaration of Denslow Green (attorney's fees in the amount of $27,410.00)). The Federal Defendants' legal efforts were equal or greater. Moreover, this lawsuit follows prior litigation brought by the Districts asserting substantially the same claims.

The Districts offer no other reason for dismissal than that they have decided not to proceed with the case. This is the second suit filed by the Districts to claim entitlement to larger CVP water allocations at the expense of intervenors. Similar legal actions can be anticipated in every short-water year until the disputed water rights are adjudicated. The Districts' explanation is insufficient.

Although filed after the motion for dismissal, summary judgment motions by the Federal Defendants and the defendants-in-intervention are pending. The Court deferred hearing the motion to dismiss to enable complete briefing of the motions for summary judgment. The Districts request for voluntary dismissal without prejudice is DENIED.

## IV. Motions for Summary Judgment

### A. Requests for Judicial Notice

The Districts request judicial notice of the following:

(1) California Water Rights Board Decision 990 ("D–990");

(2) California Water Rights Board Notice of Hearing, dated March 22, 1961;

(3) California Water Rights Board Decision 1020 ("D–1020");

(4) Report to the San Joaquin Valley Drainage Program, Legal and Institutional Structures for Managing Agricultural Drainage in the San Joaquin Valley: Designing a Future;

(5) Declaration of Franklin E. Dimick in Support of Federal Defendants–Appellants' Application for Emergency Relief, filed in *Westlands Water Dist. v. United States* ("*Westlands II—Appeal*"), 43 F.3d 457 (9th Cir.1994);

(6) Declaration of John Burke in Support of Opposition to Exchange Contractors' Memorandum in Support of Expedited Hearing on Legal and APA Issues, filed in *Westlands Water Dist. v. United States* ("*Westlands II*"), 850 F.Supp. 1388 (E.D.Cal.1995).

The Friant Intervenors request judicial notice of the following:

(1) Framework Agreement Between the Governor's Water Policy Council of the State of California and the Federal Ecosystem Directorate;

(2) Principles for Agreement on Bay–Delta Standards Between the State of California and the Federal Government ("the Bay–Delta Accord");

(3) D–990;

(4) D–1020.

Federal Rule of Evidence Rule 201 provides in pertinent part, "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. A court shall take judicial notice if

requested by a party and supplied with the necessary information." Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo,* 971 F.2d 244, 248 (9th Cir.1992).

The California Water Rights Board decisions and notice, the San Joaquin Valley Drainage Program Report, and the federal agreements satisfy Rule 201(b)(2). No party has objected to the Burke or Dimick Declaration. The requests for judicial notice of the existence of these documents and of their contents are GRANTED.

## B. Mootness

■ Plaintiffs seek injunctive and declaratory relief with respect to the Bureau's 1994 water allocations. The 1994 water year has now ended, raising the question of mootness. *See Western Oil & Gas Ass'n v. Sonoma County,* 905 F.2d 1287, 1290 (9th Cir.1990) ("An action is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."), *cert. denied,* 498 U.S. 1067, 111 S.Ct. 784, 112 L.Ed.2d 846 (1991). An issue that is "capable of repetition yet evading review" will not be dismissed as moot. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). In order to be "capable of repetition yet evading review," two requirements must be met: (1) the challenged action must be too short in duration to be fully litigated prior to its cessation or expiration, and (2) there must be a reasonable expectation that the same plaintiffs will be subjected to the same action again. *Id.*

■ The Federal Defendants argue that this case is not moot. No other parties have addressed this argument. Water allocations occur annually. They are first announced on February 15 and may be modified later in the year, depending upon available CVP water. The water allocation for one year applies only to that year. Since 1992, a single year's allocation has proved too short in duration to be fully litigated prior to its expiration. From 1992 through 1994, the plaintiffs received reduced water allocations. The Bureau did not apportion water equally among all CVP water users but granted the Ex-change Contractors priority, based on the Bureau's interpretation of different water users' respective rights, and the Districts filed suit challenging the Bureau's interpretation of those rights. Considering the reallocation of water effected by the Central Valley Project Improvement Act ("CVPIA"), Pub.L. No. 102–575, 106 Stat. 4706 (1992), and the frequency of drought in California, there is a reasonable expectation that in future years the Bureau will again reduce the Districts' CVP water allocation but not the Exchange Contractors' allocation. There is a reasonable certainty the Districts will challenge future allocations, unless the parties' respective CVP water rights are finally adjudicated. They have filed three lawsuits challenging CVP water allocations since 1992. The Districts claims are capable of repetition yet evading review. The case is not moot.

## C. The Districts' Rule 56(f) Request

■ The Districts argue that summary judgment is inappropriate, because they have not been permitted to complete discovery. Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

As the United States Supreme Court has stated, "[Rule 56(f) ] allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an *opportunity* to make full discovery." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (emphasis added). The permissive language of the rule and of the Supreme Court's clarification demonstrate that the decision to continue or deny a summary judgment motion on Rule 56(f) grounds is within the district court's discretion.

■ The dispute between the parties over their respective rights to federal water has been actively litigated since 1992. The

Scheduling Conference Order issued September 2, 1994, was fashioned with the direct participation and input of all parties. The amount of discovery and the amount of time to complete discovery were specifically addressed. Extra time was expressly requested by and provided for the Districts to conduct discovery, over the informal protests of the defendants and intervenors, who maintained there was no need for further discovery. The discovery cut-off date set by that Order is March 3, 1995. By their own admissions, the Districts elected not to pursue discovery, see Districts' Consolidated Opposition at 17:14–15, although they were afforded extra time and have had every opportunity to conduct discovery for ten months before the motions for summary judgment were filed.[9] Nor can plaintiffs suggest they were "lulled" into not undertaking discovery. They have been on notice long before filing of this case that the federal defendants and intervenors considered plaintiffs' claims insufficient as a matter of law. See Westlands I, 805 F.Supp. at 1505.

The Chisum Declaration asserts that a number of issues require discovery. These are issues on which extensive evidence has already been received at the hearing on the motion for preliminary injunction,[10] or issues that are questions of law rather than questions of fact.[11]

The Districts have been permitted a fair opportunity for discovery. They elected not to conduct discovery. The Districts have not shown there are key issues upon which additional discovery is necessary. The Districts did not timely move to amend the Case Management Order to alter the final discovery cutoff. The Districts' repeated claims prejudice the intervenors' efforts to refinance the Friant Power Project and jeopardize the financial viability of that project. Any one of these reasons is sufficient to support the

denial of the Districts' request to continue the summary judgment motions. The request is DENIED.

### D. Standards for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists when the nonmoving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *Id.* at 249, 106 S.Ct. at 2510–11.

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

---

**9.** The Complaint and Motion for Preliminary Injunction were filed March 4, 1994. The first motion for summary judgment was filed January 9, 1995.

**10.** For example, that the Friant contracts foresaw and were designed to prevent the conditions sought to be imposed by plaintiffs was analyzed at some length. *See Westlands,* 864 F.Supp. at 1546–48.

**11.** For example, whether apportioning water ignores the substance of the Exchange Contractors' riparian rights, or whether the Districts' asserted interpretations are unreasonable and violate fifty years of water contracting history. (Examples mentioned in the Chisum Declaration.) That Declaration incorporates by reference the Districts' Separate Statement of Facts, suggesting additional issues that require discovery. However, these facts have either been previously determined or present issues of law.

574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. Even where the basic facts are undisputed, if reasonable minds could differ as to the inferences to be drawn from those facts, summary judgment should be denied. *Hopkins v. Andaya,* 958 F.2d 881, 888 (9th Cir. 1992). The Court's role on summary judgment, however, is not to weigh the evidence, but only to identify disputed issues. *Id.*

▆▆▆ Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in 56(e). *Hal Roach Studios Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir.1989). Properly authenticated documents, including discovery documents, although not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *United States v. One Parcel of Real Property,* 904 F.2d 487, 491–92 (9th Cir.1990); *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 883 (9th Cir.1982), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Supporting and opposing affidavits must be made on personal knowledge, must set forth such facts as would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e); *see also, Taylor v. List,* 880 F.2d 1040, 1045 n. 3 (9th Cir.1989).

"Questions of statutory construction and legislative history present legal questions which are properly resolved by summary judgment." *Coyote Valley Band of Pomo Indians v. United States,* 639 F.Supp. 165, 167 (E.D.Cal.1986); *see also Asuncion v. District Director,* 427 F.2d 523, 524 (9th Cir. 1970).

**E. Contract Interpretation**

The water service contracts between the Districts and the Bureau are the bases for the Districts' Complaint. The Districts seek injunctive and declaratory relief requiring the Bureau to apportion water equally among all recipients of water from the San Luis Unit. The intended result is to reduce the allocation to the Exchange Contractors from 75% while raising the allocation to the Districts from 35%, until all recipients receive the same percentage of their full contractual supplies. The Exchange Contractors assert that a reduction of their allotment below 75% would be a breach of the Exchange Contract, as amended. If the Exchange Contract is breached, the Exchange Contractors have the right to the "reserved water" that currently flows into Millerton Lake. The Friant Intervenors, who receive water from Millerton Lake, argue that they will receive less water if the Districts are granted relief and the Exchange Contractors assert their rights to reserved water.[12]

The Districts argue that three categories of dispute preclude summary judgment:

(1) There is a factual dispute about the Exchange Contractors' priority to CVP water;

(2) There is a factual dispute whether pro rata allocation would violate the Friant contracts; and

(3) The terms of the Districts' water supply contracts unambiguously give the Exchange Contractors no priority; or, alternatively, the contracts are ambiguous and cannot be interpreted on a motion for summary judgment.

**1. The Exchange Contractors' Priority to CVP Water**

▆▆▆ The Districts argue that the Ninth Circuit has already rejected the contention that the Exchange Contractors have a priority to CVP water, relying on *Westlands I— Appeal,* 10 F.3d at 675. The meaning of the Ninth Circuit's opinion is a question of law appropriately resolved on summary judgment, *see Coyote Valley,* 639 F.Supp. at 167, not an issue of fact.

The Ninth Circuit stated, "Unlike the district court, we are not convinced that the Exchange Contractors, prior appropriators of water from one river, have superior water rights ... to water from a different source."

12. The Friant Intervenors do not contest the Exchange Contractors' rights to reserved water and join with the Exchange Contractors and the Bureau in opposing the Districts' claims.

*Westlands I—Appeal,* 10 F.3d at 675. This issue has now been fully briefed and considered at the evidentiary hearing on the motion for preliminary injunction:

> The Ninth Circuit did not have before it the CVP contract history giving rise to the rights claimed by the parties before the Court.... The Ninth Circuit neither analyzed, nor resolved, all contractual interpretation issues involved. Unlike the earlier motion decided solely on the pleadings, evidence has now been presented both in support and opposition to the motion.

*Westlands III,* 864 F.Supp. at 1542. Evidence of the complete CVP contracting history among all the parties has now been analyzed.

■ The 1902 Reclamation Act requires deference to the substance and form of state water law. *California v. United States,* 438 U.S. 645, 675, 98 S.Ct. 2985, 3001, 57 L.Ed.2d 1018 (1978); 43 U.S.C. § 383. The California legislature intended that "no right to the use of water shall be gained or lost by reason of any exchange thereof," and the United States Congress has confirmed the United States' obligation under the exchange contracts "to replace the waters of the San Joaquin River with waters from the Sacramento River." *Wolfsen v. United States,* 162 F.Supp. 403, 407–08 (Cl.Ct.), *cert. denied,* 358 U.S. 907, 79 S.Ct. 233, 3 L.Ed.2d 228 (1958). The apportionment sought by the Districts "ignores the substance of the Exchange Contractors' riparian rights, and could result in periodic takings under the just compensation clause." *Westlands III,* 864 F.Supp. at 1548 (citing *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 734, 70 S.Ct. 955, 960, 94 L.Ed. 1231 (1950)).

■ The Districts argue that a factual dispute exists whether the Exchange Contractors' use of water has been reasonable. A party has water rights only to the reasonable use of water. Cal. Const.Art. 10, § 2. The reasonableness of the use of water is a question of fact. *Rank v. Krug,* 142 F.Supp. 1, 111 (S.D.Cal.1956), *aff'd in part,* 293 F.2d 340 (9th Cir.1961), *aff'd in part,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963).

The focus of this case is whether the *Bureau* acted arbitrarily, capriciously, or unreasonably in allocating federal CVP water and in refusing to apportion San Luis Unit water among the Exchange Contractors equally with the Districts. The reasonableness of the Exchange Contractors' use of substitute water received pursuant to the Exchange Contract is not part of any claim alleged in the Complaint by the Districts, nor was it raised until the time of these motions for summary judgment. The Bureau has a contractual obligation to honor the Exchange Contractors' historical water rights to CVP water. That obligation takes precedence over the Districts' contractual water rights, which are to *surplus* CVP water. The Districts' argument is disingenuous: that the Bureau should have challenged the Exchange Contractors' reserved water rights based on alleged misuse before the appropriate state agency, when neither the Districts nor anyone else has ever done so. Moreover, in challenging the reasonableness of the Exchange Contractors' water usage, the Bureau would be acting to deprive the Exchange Contractors of the very water supply the Bureau covenanted in good faith to provide the Exchange Contractors.

Assuming *arguendo* that such a claim can be asserted, the claim that the Exchange Contractors' water usage is unreasonable is premature and not ripe for decision here. The parties have not briefed this question of California law. Independent research shows that a challenge to the Exchange Contractors' reasonable use of water must be made by applying to the State Water Resources Control Board for unappropriated water, if the Districts in good faith contend the Exchange Contractors unreasonably use water, pursuant to article 10, section 2. *See* Cal. Water Code § 179 (State Water Resources Control Board "is vested with all of the powers, duties, purposes, responsibilities, and jurisdiction" of laws "under which permits or licenses to appropriate water are issued, denied, or revoked"). If the water is not being applied reasonably, it is available for appropriation. *Id.* §§ 1201 (water, not "being applied to useful and beneficial purposes" or "reasonably needed for useful and beneficial purposes" on riparian lands, is available for appropriation), 1202 (water previously appropriated but no longer "being put ... to the useful or beneficial purpose for which it

was appropriated, with due diligence in proportion to the magnitude of the work necessary properly to utilize it for the purpose of the appropriation" is available for appropriation).

 Federal courts lack jurisdiction to decide state water permit applications. *United States v. Fallbrook Pub. Util. Dist.*, 165 F.Supp. 806, 857 (S.D.Cal.1958). The Districts' argument that the Exchange Contractors do not make reasonable use of their water allocation has been waived by the Districts' failure to exhaust the appropriate administrative remedies and the failure to assert the claim in the Complaint. No motion to amend the Complaint has been filed by the Districts. Nonetheless, this issue does not bear on the legal interpretation of the parties' contracts and historical water rights.

### 2. Pro Rata Allocation and the Friant Contracts

 The opinion denying the preliminary injunction decided the question whether pro rata allocation as argued by the Districts was precluded by the Friant contracts. The Exchange Contract provides in the event of shortage, "the United States shall make up such quantities by releases of available storage from Millerton Lake" to minimum storage capacity. Exchange Contract Art. 4(b). The twenty-seven Friant water districts receive San Joaquin River water from Millerton Lake. All twenty-seven contracts between the Friant water districts and the United States acknowledge that the rights of the contracting district are subject to the terms of the Exchange Contract.

In 1959, the Bureau applied to the California State Water Resources Control Board for a place-of-use application for the proposed San Luis Unit (the D–990 Decision). In consideration of the Friant water districts' non-opposition to the application, the Bureau agreed to amend the contracts to protect the Exchange Contractors' priority.[13] Evidence of this agreement includes a letter from Robert E. Moock, dated October 31, 1959;[14] a letter from Adolf Moskovitz, dated November 19, 1959;[15] and a Memorandum of Understanding drafted by the Bureau on December 29, 1959.[16]

Under the amended contracts, the United States agrees (1) it will not deliver water from the San Joaquin River to the Exchange Contractors "unless and until required by the terms of [the Exchange Contract] so to do"; and (2) "it will not voluntarily and knowingly render itself unable to deliver" water to the Exchange Contractors from the Sacramento River sufficient to meet the obligations of the United States under the Exchange Contract. *Westlands III*, 864 F.Supp. at 1546–47.

The Districts argue that because the amendments relied upon in the previous opinion related to D–990, there remains a disputed issue of fact whether they relate to

---

**13.** None of the Friant water districts are Exchange Contractors. Their interest in protecting the priority of the Exchange Contractors requires explanation: if the Exchange Contractors' priority to water from the Sacramento River is not protected, the Bureau may fail to deliver sufficient water to meets its obligations under the Exchange Contract; in that case, the Exchange Contractors could exercise their reserved water rights in the San Joaquin River. The Friant water districts would be deprived of water to the extent the Exchange Contractors exercised their reserved water rights.

**14.** The letter states, in part:

I told the group [in a conference with the Bureau of Reclamation] that the Friant–Kern area would not go for this expansion of place of use unless the United States recognized a preference for the exchange contract and that water necessary to serve the present service areas of the Contra Costa Canal.... To my surprise, my suggestion was somewhat favor-

ably received, and it appears to me that the time is ripe for the procurement of a commitment from the Bureau of Reclamation for the preferential treatment of the exchange contract which we have been seeking.

**15.** Reading, in part, "I believe this is an excellent opportunity for the Friant water users to obtain binding contractual assurances of the preferential status of the exchange contract."

**16.** Reading, in part:

I confirm to you that it has been, is and will continue to be the policy and practice of the United States to utilize the water available ... from the Sacramento River ... to first satisfy the requirements of the Exchange Contract ... so long as it is legally and reasonably physically possible to satisfy these requirements; provided that the United States has not, and will not voluntarily impair the delivery of water required to satisfy those requirements.

the expanded service area provided in D–1020, because the Friant Intervenors did not seek to again amend their contracts. This argument is meritless. As the analysis shows, the amendments were sought to protect the Friant Intervenors' rights to water deliveries when the Bureau was expanding its service area. Having obtained that contractual protection from the Bureau during the D–990 proceedings, there was no need for the Friant Intervenors to seek a further amendment during the D–1020 proceedings, which did not address or affect the contractual priorities previously obtained and confirmed during the D–990 proceedings.

### 3. Ambiguity of the Districts' Contracts

The Districts argue summary judgment must be denied because (1) their contracts with the Bureau unambiguously prohibit the Bureau from subordinating the Districts' water claims to the claims of the Exchange Contractors; or alternatively (2) their contracts are ambiguous on this issue, and differing views of intent preclude summary judgment.[17] Districts' Supplemental Memorandum at 2:4–24. The fundamental difficulty with the Districts' position is that they seek to view their contracts with the Bureau in a vacuum, as if all water rights are to be determined only by reference to the Westlands and San Benito Contracts. This approach ignores reclamation law and CVP contracting history.

Article 11(a) of the Westlands contract provides for apportionment of water if a shortage occurs:

There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project.... In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit in accordance with conclusive determinations of the Contracting Officer as follows:

(i) A determination shall be made of the total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit, the quantity so determined being hereinafter referred to as the contractual commitments;

(ii) A determination shall be made of the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments, the quantity so determined being hereinafter referred to as the available supply;

(iii) The total quantity of water agreed to be accepted by the District during the respective year, under Article 3 hereof, shall be divided by the contractual commitments, the quotient thus obtained being hereinafter referred to as the District's contractual entitlements; and

(iv) The available supply shall be multiplied by the District's contractual entitlement and the result shall be the quantity of water required to be delivered by the United States to the District for the respective year....

No party argues that Article 11(a) is not the final expression of the agreement between Westlands and the Bureau on the apportionment of water during a shortage. No evidence of any other agreement on water apportionment between Westlands and the Bureau has been submitted by any party. Article 11(a) is the final agreement between Westlands and the Bureau on the apportion-

---

**17.** The Districts argue,

[The] Districts have submitted evidence from which it can be inferred that the contracting parties (Westlands, San Benito, and the United States) did not intend to subordinate the contractual rights of the Districts to those of the Exchange Contractors. The most persuasive evidence from which this intent can be inferred is water service contracts between the United States and other contractors, which

specifically subordinate the rights of those other contractors to the rights of the Exchange Contractors.

Districts' Supplemental Memorandum at 9:1–6. As the analysis shows, although the Westlands and San Benito Contracts do not use the same language as other water service contracts, they also unambiguously subordinate the rights of the Districts to the rights of the Exchange Contractors.

ment of water during a shortage. No offer of proof of any extrinsic evidence relevant to the contractual language has been made by Westlands.

Article 7(b) of the San Benito Contract provides a similar apportionment formula:

> In any year that the Contracting Officer determines there is a shortage in the quantity of water available to customers of the United States from the Project, the Contracting Officer will apportion available water among the water users capable of receiving water from the same Project facilities by reducing deliveries to all such water users by the same percentage, unless he is prohibited by existing contracts, Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship.

No party argues that Article 7(b) of the San Benito Contract is not the final agreement between San Benito and the Bureau on water apportionment. No evidence of any other agreement on water apportionment between San Benito and the Bureau has been submitted by any party. Article 7(b) is the final agreement between San Benito and the Bureau on the apportionment of water during a shortage. No offer of proof of any extrinsic evidence relevant to the contractual language has been made by San Benito.

■ Federal law controls the interpretation of a contract where the United States is a party. *United States v. Seckinger,* 397 U.S. 203, 209, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1032 (9th Cir. 1989). "The Uniform Commercial Code is a source of federal common law and may be relied upon in interpreting a contract to which the federal government is a party." *O'Neill,* 50 F.3d at 684 (applying the UCC to interpret article 11 of the Westlands contract).

■ Whether a contract is ambiguous is a question of law. *United States v. Sacramento Mun. Util. Dist.,* 652 F.2d 1341, 1343–44 (9th Cir.1981); *United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp.,* 577 F.2d 568, 572 (9th Cir.1978). Ambiguity exists when a contract is subject to more than one reasonable interpretation. *Kennewick Irrigation Dist. v. United States,*

880 F.2d 1018, 1032 (9th Cir.1989). "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Id.* (quotation omitted); *see also International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1406 (9th Cir. 1985).

"[G]overnmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." *Peterson v. United States Dept. of the Interior,* 899 F.2d 799, 807 (9th Cir.) (citing *Federal Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 87–88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958)), *cert. denied,* 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). The Westlands and San Benito contracts were authorized by reclamation law. *See* 43 U.S.C. § 485h(d), (e).

■ Although traditionally, an implementing agency is granted deference in its interpretation of statutes and regulations, where the rights at issue arise under contract, the rule of agency deference is inapplicable. *Clay Tower Apartments v. Kemp,* 978 F.2d 478, 480 (9th Cir.1992). However, the parties' conduct subsequent to the formation of the contract is entitled to "great weight" in determining the meaning of that contract. *Arizona Laborers, Teamsters and Cement Masons v. Conquer Cartage Co.,* 753 F.2d 1512, 1518 (9th Cir.1985).

■ Extrinsic evidence of trade usage, course of dealing, and course of performance between the parties may be considered to determine whether a contract is ambiguous. *O'Neill,* 50 F.3d at 684. This extrinsic evidence cannot contradict a clear contract term in a final expression of agreement, but it may explain or supplement the agreement. *Id.* at 684–85. The Districts have not identified any trade usage, course of dealing, or course of performance that supports the interpretation of the Westlands and San Benito Contracts they advance: that the Bureau must *pro rata* apportion San Luis Unit water among all parties entitled to receive water from the Unit, when there is a shortage of CVP water.

1320

No term in the Westlands Contract or the San Benito Contract expressly forbids the Bureau from subordinating the Districts' rights to water to the prior rights of the Exchange Contractors. The Districts infer such an agreement in their contracts by the Districts' proposed "reasonably objective meaning" (Districts' Supplemental Memorandum at 3:8) of the terms "available water supply" [18] and "contracts" in the Westlands Contract and "available water" and "customers of the United States" in the San Benito Contract. Alternatively, the Districts argue that these terms *are* ambiguous, and the ambiguity precludes summary judgment.

The Districts argue:

it is necessary to consider that a long-standing definition of contract, in existence when both the Westlands and San Benito contracts were drafted, states: "a contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."

Districts' Consolidated Opposition at 29:24–30:1 (quoting Restatement of Contracts § 1 (1932)). The Districts argument that the classic definition of "contract" from the Restatement should be considered ignores the indisputable fact that these contracts were made under *reclamation law.*

#### a. The Term "Available Water Supply"

■ The Westlands Contract defines "available water" as,

the total quantity of water from the Central Valley Project which is available for meeting contractual commitments. . . .

Westlands Contract ¶ 11(a)(ii). As the opinion deciding the motion for preliminary injunction discussed at length, the San Luis Unit was constructed to utilize "surplus" water not required to satisfy the rights of existing water-rights holders, including the Exchange Contractors:

The operation of the federal San Luis Unit would conserve and regulate *surplus wintertime water now wasting into the Pacific Ocean* through the Golden Gate and make it usable, along with additional Central Valley Project Water from storage, in the

water-deficient San Joaquin Valley to the south.

H.R.Rep. No. 399, 86th Cong., 2d Sess. 2 (1960) (emphasis added).

The Bureau's 1949 "Comprehensive Departmental Report on the Development of the Water and Related Resources of the Central Valley Basin" ("Feasibility Report"), transmitted to Congress before the passage of the San Luis Act noted that the San Luis Project would receive surplus water. *See, e.g.,* Feasibility Report at 129–30 ("Pumping to the [San Luis] reservoir under initial development or in dry periods under ultimate development would be chiefly from surplus winter and spring flows from the Sacramento River."); *id.* at 220 ("[San Luis Reservoir water will be] secured almost entirely by pumping through the Delta–Mendota canal at such times as the full capacity of the canal is not required for initial Central Valley project needs."). The Feasibility Report also noted, *"Water rights for existing irrigation developments are superior to any which may accrue to new developments." Id.* at 104 (emphasis added).

Congressional discussion prior to enactment of the CVPIA acknowledges the superior rights of the Exchange Contractors:

A very significant change is how dry year shortages are dealt with. The House had suggested that the 800,000 acre-feet and the wildlife refuge water be subject to reduction only when shortages are imposed on *prior right and exchange right holders.* Aside from the implicit taking, *since those rights are secured under State law and are superior to any CVP right,* that provision would have never worked in practice.

During the current drought, prior right and exchange right holders agreed to forgo certain deliveries in order to permit the Secretary to make deliveries to the wildlife refuges and to urban users. *No reductions were imposed on them since no reductions could be imposed so long as there was any water.*

138 Cong.Rec. S17658, 17660 (Sept. 30, 1992) (statement of Sen. Wallop) (emphasis added).

18. Or "available supply."

The CVPIA preserves the distinction in reclamation law between surplus water obtained by the construction of the CVP and water that belongs as a matter of right to prior appropriators:

> [T]he term "Central Valley Project yield" means the delivery capability of the Central Valley Project during the 1928–1934 drought period *after* fishery, water quality, and *other flow and operational requirements imposed by terms and conditions existing in* licenses, permits, and *other agreements pertaining to the Central Valley Project* under applicable State or Federal law existing at the time of enactment of this title have been met.

CVPIA § 3406(b)(2) (emphasis added). The commitment of water to the Exchange Contractors is one of the "other flow and operational requirements imposed by terms and conditions existing in ... agreements pertaining to the Central Valley Project" that must be satisfied before the calculation of CVP yield is made.

The foregoing analysis demonstrates that reclamation law prioritizes appropriative state water rights over rights that were created under contracts for federal CVP water after the construction of the CVP. This distinction in law existed at the time the San Luis Act was passed, and it continues in the most recent 1994 passage of the CVPIA. In light of the express policies underlying the controlling legislation, the only reasonable interpretation of the term "available water supply" in a repayment or a water service contract such as the Westlands and San Benito Contracts is: that amount of CVP water determined to be available *after* satisfying the superior claims of the Exchange Contractors and other holders of prior rights to CVP water. The prior entitlements of the Exchange Contractors to Sacramento River water are not part of the "available water supply" as that term is used in the Westlands Contract.

The preamble of the Westlands Contract demonstrates that the contracting parties understood Westlands would receive water surplus to the requirements of prior appropriators, such as the Exchange Contractors:

> [I]nvestigations of the stream flow in the Sacramento River, the Trinity River, the American River, the San Joaquin River,

and their tributaries indicate that there will be available for furnishing to the District from the San Luis Unit *an additional water supply* for surface diversion and direct application for irrigation and directly or indirectly to replenish depleted ground water underlying the District. . . .

Westlands Contract at 3:1–7 (emphasis added).

The foregoing analysis also applies to the term "available water" in the San Benito Contract. The San Benito Contract is a water service contract. Reclamation law dictates that the only reasonable definition of the term "available water" in the context of ¶ 7(b) is the water available after satisfying the superior rights of the Exchange Contractors. The language of ¶ 7(b) expressly recognizes that rights to apportionment are subject to "existing contracts [and] Project authorizations." The Exchange Contract, the Friant contracts, and congressional reclamation legislation, such as the CVPIA, are "existing contracts [and] Project authorizations" to which the San Benito Contract is subject.

No evidence of trade usage, course of dealing, or course of performance has been offered by the Districts to alter the conclusion that the term "available water supply" in the Westlands and San Benito Contracts excludes the allocation of CVP water due the Exchange Contractors.

#### b. The Term "Contracts"

The CVPIA, the most recent substantive enactment of reclamation law, identifies four types of water-delivery contracts: "repayment contracts," "water service contracts," "water rights settlement contracts," and "exchange contracts." CVPIA §§ 3403(k), 3405(a). The definition of "repayment contract," since at least the Reclamation Project Act of 1939, Pub.L. No. 76–260, 53 Stat. 1187 (1939), is "any contract providing for repayment of construction charges [of a reclamation project] to the United States." 43 U.S.C. § 485a(e) (codifying section 2(e) of the 1939 Act). "Water service contracts" are not defined by statute. When the CVPIA refers to water service contracts, it cites section 9(e) of the 1939 Reclamation Act, which discusses "short- or long-term contracts to furnish water for irri-

gation." *See* Reclamation Project Act of 1939, ch. 418, § 9(e), 53 Stat. 1187, 1196 (codified at 43 U.S.C. § 485h(e)).[19] For purposes of this case, water service contracts are practically identical to repayment contracts. "Water rights settlement contracts" and "exchange contracts" are not defined by statute. "Exchange contracts" are the type held here by the Exchange Contractors, in which a holder of water rights in one river exchanges those rights for water rights from another source, as the Exchange Contractors exchanged their historical rights to water from the San Joaquin River for water from the Sacramento River and its tributaries. Exchange contracts are a subset of water rights settlement contracts. *See Westlands I,* 805 F.Supp. at 1504.

■ The opinion deciding the motion for preliminary injunction notes that the term "contract" in the Westlands Contract is defined by federal reclamation law:

> any repayment or water service contract between the United States and a district providing for the payment of construction charges to the United States including normal operation, maintenance, and replacement costs pursuant to Federal Reclamation law.

43 U.S.C. § 390bb(1). Closer scrutiny reveals this definition is applicable only to the term "contract" as used in the Reclamation Reform Act of 1982, which amended the procedures and requirements for new and amended water service contracts and repayment contracts. The Reclamation Reform Act of 1982 does not appear to have any impact on water rights settlement contracts or exchange contracts.

■ The term "contracts" must be interpreted in conjunction with the term "available water supply." Analysis of the term "available water supply" excludes *a fortiori* the Exchange Contractors' prior contractual water entitlement, which must be satisfied before calculation of the available water supply under ¶ 11(a) of the Westlands Contract or ¶ 7(b) of the San Benito Contract. If the Exchange Contractors' entitlement to water is excluded from the calculation of the avail-

able water supply, then the Exchange Contract must also be excluded from the meaning of the term "contracts" in ¶ 11(a) of the Westlands Contract. Any other conclusion would give ¶ 11(a) a novel meaning that no party proposes. The only reasonable definition of "contracts" in the context of ¶ 11(a) is repayment or water service contracts, not prior water-rights settlement contracts or exchange contracts that concern pre-CVP water rights.

Placement of the term "contracts" in ¶ 11(a) of the Westlands Contract following the term "available water supply," all prior to the phrase "among the District [Westlands] and others entitled under the then existing contracts to receive water from the San Luis Unit" is language that expressly limits the apportionment formula to Westlands and other contractors who have existing contracts to receive water from the San Luis Unit. The Districts seek to apply the apportionment formula to the Exchange Contractors, to place them in the same category as Westlands, San Benito, and other San Luis Unit water service contractors. The Exchange Contractors have no direct (express) contract to receive water from the San Luis Unit. By a contract entered over two decades before the creation of the San Luis Unit, the Exchange Contractors are entitled to CVP water from the Sacramento River and its tributaries to be provided by the Bureau according to the terms of the Exchange Contract. Since the creation of the San Luis Unit, water to satisfy this obligation has been furnished from the San Luis Unit, but it has never been part of the "available water supply" of the San Luis Unit. This language is not susceptible to another meaning.

■ In light of the definition of "available water supply" and "contract" in ¶ 11(a) of the Westlands Contract, Westlands has no contractual entitlement to equal apportionment of San Luis Unit water with the Exchange Contractors, to the contrary: the Westlands Contract recognizes the superior right of the Exchange Contractors to receive their con-

19. The CVPIA cites 53 Stat. 1195, while 1 Bureau of Reclamation, U.S. Dep't of Interior, *Federal Reclamation and Related Laws Annotated* 656 (Richard K. Pelz ed., 1972), cites 53 Stat.

1196. *Federal Reclamation and Related Laws Annotated,* the source available to the Court, has been followed in this Memorandum Opinion.

tracted-for CVP water before any CVP water is available to the San Luis Unit. Westlands has produced no evidence of trade usage, course of performance, or course of dealing to "clarify" that the term "contracts" has any other meaning in the context of ¶ 11(a). Paragraph 11(a) provides that the Bureau may apportion water among San Luis Unit recipients when a shortage occurs "from any cause." Fulfilling the pre-existing right of the Exchange Contractors to water from the Sacramento River and its tributaries is one such cause.

### c. The Term "Customers of the United States" in the San Benito Contract

■ "Customer of the United States" is not defined in the San Benito Contract. The common definition of "customer" has been applied:

> Generally, a "customer" is a "buyer, purchaser, consumer or patron," or "one that purchases usually systematically or frequently a commodity or service."

*Westlands III,* 864 F.Supp. at 1545–46 (quoting Black's Law Dictionary at 386 (6th ed. 1990), and Webster's New Collegiate Dictionary at 278 (1981)). While contractors with repayment contracts or water service contracts purchase CVP water from the Bureau on a yearly basis, the Exchange Contractors pay no money for CVP water. Districts with repayment or water service contracts are "customers of the United States." The Exchange Contractors are " 'suppliers' of water [to], rather than 'customers of the United States.' " *Id.* at 1546.

The Districts argue that the Exchange Contractors might still be considered "customers," because they have used their riparian water rights to "purchase" substitute water. This argument ignores the substance of that transaction. It was not the Exchange Contractors who sought CVP water. The exchange agreement was essential to enable the government to acquire San Joaquin River water to implement expansion of the CVP long before the creation of the San Luis Unit. The Exchange Contractors' benefit from that

agreement, by which they surrendered their San Joaquin River water rights, was to obtain an assured supply of substitute water (or, in a worst case scenario, "reserved" water from the San Joaquin River, stored in Millerton Lake). They are still, very much, "suppliers" rather than "customers," a designation that is borne out by the difference in their contractual relation with the Bureau compared with the relations of the Districts. No District offered evidence of any trade usage, course of dealing, or course of performance to alter this conclusion as to the meaning of the term "customers of the United States" as used in ¶ 7(b).

In the motion for preliminary injunction, the Districts' burden was to show that "the law and the facts clearly favor their contention that the Bureau acted arbitrarily, capriciously or unreasonably ... in failing to apportion water with the Exchange Contractors." *Westlands III,* 864 F.Supp. at 1548. A different standard applies to the Federal Defendants' and the intervenors' motions for summary judgment, but the conclusion is the same. The Federal Defendants and the defendants-in-intervention have shown that there is no genuine issue as to any material fact concerning interpretation of the relevant sections of the Westlands and San Benito contracts. Subjecting the Exchange Contractors to a pro rata water allocation along with the Districts ignores the Exchange Contractors' historical priority to CVP water. It would also violate the Friant contracts. Finally, the Westlands and San Benito Contracts do not unambiguously require that the Exchange Contractors receive a pro rata allocation along with the Districts; to the contrary, the contracts unambiguously respect the Exchange Contractors' priority to CVP water.

The Districts appeal to general equitable principles, suggesting that all they seek is equal apportionment of CVP water among all recipients of San Luis Unit water, so they are on an "equal footing" with the Exchange Contractors. In doing so, they imply that CVP water history commenced with the San Luis Unit. There is nothing equitable about

the Districts' position. Among water appropriators, "the one first in time is the first in right." Cal.Civil Code § 1414. The Exchange Contractors' rights to CVP Sacramento River water delivered through the Delta–Mendota Canal were perfected long before the existence of the San Luis Unit and the Westlands and San Benito Water Service Contracts.

The Memorandum Opinion and Order denying Plaintiffs' Motion for Preliminary Injunction, attached as Appendix "A," and to the extent not inconsistent, is by this reference incorporated in this Memorandum Opinion and Order. For the reasons stated in that opinion and above, the motions for summary judgment of the Federal Defendants and the defendants-in-intervention are GRANTED.

## V. Conclusion

For the foregoing reasons,

(1) The Districts' Motion for Voluntary Dismissal without prejudice is DENIED;

(2) The Federal Defendants' Motion for Summary Judgment is GRANTED;

(3) The Exchange Contractors' Motion for Summary Judgment is GRANTED;

(4) The Friant Intervenors' Motion for Summary Judgment is GRANTED;

(5) Judgment shall be entered accordingly. The Federal Defendants shall lodge a proposed Judgment in accordance with this Memorandum Opinion & Order within five (5) days following the date of service of this opinion.

SO ORDERED.

1. These contractors are: Columbia Canal Company, San Luis Canal Company, Central California Irrigation District, and Firebaugh Canal Water District.

2. The Friant Power Authority is formed by the Chowchilla Water District, Madera Irrigation District, Orange Cove Irrigation District, Lindsay–Strathmore Irrigation District, Lindmore Irrigation District, Terra Bella Irrigation District, Delano–Earlimart Irrigation District, and Southern San Joaquin Municipal Utility District.

*APPENDIX "A"*

United States District Court

Eastern District of California

WESTLANDS WATER DISTRICT, SAN BENITO WATER DISTRICT,

Plaintiffs,

v.

ROGER K. PATTERSON, REGIONAL DIRECTOR, MID–PACIFIC REGION, UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, BUREAU OF RECLAMATION; BRUCE BABBIT, SECRETARY OF THE INTERIOR,

Defendants.

CV–F–94–5217 OWW DLB

MEMORANDUM OPINION AND ORDER RE: PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

Aug. 23, 1995

WANGER, District Judge.

## I.

### INTRODUCTION

Plaintiffs Westlands Water District and San Benito Water District seek a preliminary injunction to enjoin 1994 water allocations under decisions made by the U.S. Bureau of Reclamation ("Bureau") and to compel "equitable apportionment" among other water districts. The motion is opposed by the Federal Defendants and defendants-in-intervention San Joaquin River Exchange Contractors,[1] the Friant Power Authority,[2] and certain members of the Friant Water Users Authority.[3]

3. The Friant Users Authority is a joint powers agency consisting of 25 irrigation and water districts organized under California law, and is responsible for maintaining the Friant–Kern Canal. The intervening districts are: 1) The Orange Cove Irrigation District; 2) The Shafter–Wasco Irrigation District; and 3) The Terra Bella Irrigation District.

The status of plaintiffs' counsel, the Kronick, Moscovitz law firm, the subject of a recusal motion by the Madera and Chowchilla Irrigation Districts, has been resolved by stipulation.

## II.

## BACKGROUND

On February 15, 1994, the Regional Director for the Bureau of Reclamation ("Bureau") announced annual water allocations for agricultural contractors for the 1994 water year. Plaintiffs were granted 35% of their contractual entitlement, and the San Joaquin River Exchange Contractors, 75%. On March 14, 1994 the Bureau announced that it could provide the Exchange Contracts with 100% of their contractual supply.

Plaintiffs allege that the Federal Defendants breached contractual obligations in apportioning water in shortage years. Plaintiffs complaint seeks relief on the following grounds:

*First Claim for Relief:* For injunctive relief, based on the allegation that the Bureau's 1994 allocations are contrary to the provisions of the Westlands and San Benito water service contracts, and plaintiffs have no plain, speedy and adequate remedy at law;

*Second Claim for Relief:* For declaratory relief, based on Article 11 of the Westlands contract, which obligates the Bureau to apportion water among those entitled to receive water from the San Luis Unit;

*Third Claim for Relief:* For declaratory relief, based on Article 7(b) of the San Benito contract, which obligates the Bureau to apportion available water among water users, subject to prohibitions in existing contracts, CVP authorizations or a determination that some other method of apportionment is required to prevent undue hardship.

This motion seeks to preliminarily enjoin the Federal Defendants from implementing the 1994 water allocation plan and to require the Bureau to reduce water deliveries by the same percentage among the San Joaquin River Exchange Contractors and other agricultural water contractors capable of receiving water from the facilities of the Delta Division, the West San Joaquin Division, and San Felipe Division of the Central Valley Project.

## III.

## STANDARD FOR A PRELIMINARY INJUNCTION

A court may issue a preliminary injunction if the movant meets one of two tests: First, by showing:

(1) Strong likelihood of success on the merits;

(2) The balance of irreparable harm favors the movants; and

(3) The public interest favors granting the injunction.

*Landi v. Phelps,* 740 F.2d 710, 712 (9th Cir. 1984), citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 87 (9th Cir.1975); or second, by demonstrating:

... either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tip sharply in his favor.

*Id.* Under the second formulation, the Supreme Court requires that the public interest be considered where the public may be affected. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 967 (9th Cir. 1983). The Ninth Circuit has stated that the tests are not separate, but "represent[ ] two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Oakland Tribune v. Chronicle Publishing,* 762 F.2d 1374, 1376 (9th Cir.1985).

Where a mandatory preliminary injunction is sought that goes beyond maintaining the status quo *pende lite,* "courts should be extremely cautious about issuing a preliminary injunction." *Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir. 1994). In those circumstances, an injunction should not issue "unless the facts and law clearly favor the plaintiff." *Committee of Central American Refugees v. I.N.S.,* 795

F.2d 1434, 1441 (9th Cir.1986), *amended,* 807 F.2d 769 (9th Cir.1987).

## IV.

## DISCUSSION

### Geographic/Historical Background [4]

The Central Valley Basin includes two main natural sources: 1) in the north, Shasta Lake to the Sacramento River, which together with its tributaries flow southward draining the northern part of the basin; and 2) the San Joaquin River and its tributaries, which flow northward, draining the central southern portion. The two river systems join at the Sacramento–San Joaquin Delta, flow through Suisin Bay and Carquinez Straits into the San Francisco and the Pacific.

As early as 1870, Miller & Lux began acquiring land in the San Joaquin Valley. Within the next fifty years, the corporation became the owner of large tracts of riparian and non-riparian land near the upper San Joaquin River and its tributaries. Most if not all of this land was irrigated by Miller & Lux or through its subsidiaries and affiliated canal companies.[5] Through this process, Miller & Lux, and its companies, acquired riparian rights to the flows of the upper San Joaquin River. Until Friant Dam was built, at certain times during the year, the riparian users could not use all available water, causing uncontrollable flooding.

In the mid–1930's, the United States endeavored to expand the CVP into the Kern County/Bakersfield area. To do so, it was necessary to redivert the upper reaches of the San Joaquin River into the Friant–Kern Canal and the Madera Canal, by constructing the Friant Dam. Because Miller & Lux, and others, held vested rights to water necessary to accomplish that purpose, in July, 1939, the United States and the Exchange Contractors

entered into two contracts: the Purchase Contract and the Exchange Contract.

Under the Purchase Contract, the Exchange Contractors sold all their San Joaquin River water rights to the United States, except for "reserved water," water to which the Exchange Contractors held vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their rights to reserved water, so long as they received substitute water from the Federal Delta–Mendota Canal, or other sources delivered to the Mendota Pool.[6] A second amended contract, dated September 15, 1967, is based on these 1939 Purchase and Exchange Contracts.

Millerton Lake, as it presently exists, was formed when Friant Dam was completed in 1942, and provides water to both the Madera Canal and the Friant–Kern Canal. In the 1940's, the Bureau entered into contracts with the water districts within the Friant Division. Friant Division agricultural water contractors receive water from both the Madera and Friant–Kern Canals.

The San Luis Unit of the CVP consists of the San Luis Dam and the San Luis Reservoir, together with a number of smaller facilities. The San Luis Reservoir was constructed to provide water to Merced, Fresno and Kings Counties, and is used to store surplus water from the Sacramento–San Joaquin Delta, for delivery to contractors such as Westlands and San Benito. The Delta–Mendota Canal is situated south of the Sacramento–San Joaquin Delta, and carries water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir.

### Background of the Present Litigation

In 1992, Westlands filed suit against the Bureau, seeking injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq. Westlands v. U.S.,* 805 F.Supp. 1503 (E.D.Cal.). The complaint alleged: (1)

---

**4.** This background appears in full in *Gerlach Livestock Co. v. U.S.,* 76 F.Supp. 87, 90 (Cl.Ct. 1948), *aff'd,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), and *Wolfsen v. United States,* 162 F.Supp. 403, 421 (Cl.Ct.1958), *cert. denied,* 358 U.S. 907, 79 S.Ct. 233, 3 L.Ed.2d 228 (1958).

**5.** These were, among others: The San Joaquin & Kings River Canal & Irrigation Co., Inc., Gravel-

ly Ford Canal Co., Firebaugh Canal Company, Columbia Canal Co., San Luis Canal Co., and Santa Rita Irrigation Co. *Gerlach,* 76 F.Supp. at 90.

**6.** The Mendota Pool is formed at the confluence of the San Joaquin River, Fresno Slough and Delta–Mendota Canal.

the Bureau's intended diversion of water stored in the San Luis Reservoir violated the provisions of the San Luis Act and the Westlands and San Benito Contracts; (2) the Bureau lacked authority to divert water stored in the San Luis Reservoir; and (3) the amount of water stored in the San Luis Reservoir at the time of the filing of the complaint was sufficient to supply water to plaintiffs with additional water, making the Bureau's decision to divert this water to the Exchange Contractors, while maintaining only a fifteen percent allocations to plaintiffs, arbitrary, capricious and an abuse of discretion. Plaintiffs also sought a judicial declaration of the Bureau's contractual obligations to allocate water stored in the San Luis Reservoir during a shortage.

Plaintiffs' complaint was dismissed without leave to amend. *Westlands Water District v. United States,* 805 F.Supp. 1503 (E.D.Cal. 1992). In finding that the Bureau did not act arbitrarily or capriciously in its 1992 allocation decisions, the district court stated:

> As California's drought entered its sixth year, the Bureau was faced with difficult water allocation decisions. The Bureau had the prerogative to exercise its allocation powers granted under the water shortage provisions in the relevant supply contracts. The Bureau cannot be faulted for honoring its legal commitments to holders of senior water rights, especially when it could do so without breaching its contracts with its agricultural contractors. The suggestion that a fifteen percent (15%) or twenty-five percent (25%) allocation to plaintiffs was unjustified based on actual water availability ignores the Bureau's power to determine and meet water needs on a project-wide basis. [footnote omitted]

The result was affirmed on appeal. *Westlands Water District v. Firebaugh Canal,* 10 F.3d 667 (9th Cir.1993). In its opinion, the Ninth Circuit expressed doubt about certain conclusions reached in the district court opinion:

> Neither the [San Luis] Act nor the Westlands contract prohibits the Bureau from using Reservoir water to meet its contractual obligations to the Exchange contractors, *and the Exchange contractors are therefore "entitled under the then-existing contracts to receive water from the San Luis Unit" under Article 11 of the Westlands contract. Likewise, the Exchange contractors are "capable of receiving water from the same Project facilities" under Article 7(b) of the San Benito contract,* whether "same Project facilities" is defined as the San Luis Unit or the whole CVP, since Reservoir water can be returned to the Delta–Mendota Canal.

*Id.* at 676 (emphasis added). The Ninth Circuit questioned the conclusion that San Benito's claim could be determined on the pleadings:

> We ... disagree with the district court that the San Benito contract's apportionment provision was inapplicable as a matter of law. Even if the district court was correct in ruling that the Exchange contractors had rights senior to the San Luis Contractors, the San Benito contract provides that apportionment is not required when do so is "prohibited by existing contracts." Appellees did not establish as a matter of law that the Bureau had to divert Reservoir water to meet its contractual obligations to the Exchange contractors. One possibility is that the Bureau could have met those obligations by releasing water from Millerton Lake, as the Exchange Contract expressly contemplates. The pleadings alone do not resolve this issue.

*Westlands,* 10 F.3d at 675–76 (emphasis added and citations and quotations omitted). The Ninth Circuit also stated:

> We believe that the San Luis Contractors should not be foreclosed from arguing in a future suit that the Bureau has violated its contractual obligations to apportion water as required by the Westlands and San Benito contracts.

*Id.* at 677, n. 8. The circuit court also doubted certain conclusions about the Exchange Contractors' rights under state law:

> We are not convinced that the Exchange Contractors hold rights to Reservoir water which are superior to the rights of the San Luis contractors. It is true that some California cases recognize the general doctrines of "first in time, first in right" or "prior appropriation." [citations] Howev-

er, these cases do not clearly decide the issue here. The Exchange contractors took water from the San Joaquin River prior to the contractual right to substitute water from the Delta–Mendota Canal or other sources. The Exchange Contract clearly gives them a contractual right to substitute water from the Delta–Mendota Canal or other sources. The Delta–Mendota Canal, however, takes water from the Delta which would otherwise wash into the sea. The Reservoir did not even exist at the time of the execution of the Exchange Contract. Article 4 of the Exchange Contract requires the Government to give notice to future parties contracting for the use of San Joaquin River water of the prior rights of the Exchange contractors to water from different sources. Unlike the district court, we are not convinced that the Exchange contractors, prior appropriators of water from one river, have superior water rights (i.e. vested property rights) to water from a different source....

Plaintiffs do not raise this issue of California water law for reconsideration in this proceeding, expressly disclaiming the argument that superior state water entitlements justify the relief they seek. Plaintiff's Reply Memorandum, at 5:22–24 ("[T]o determine the rights of each group, this court must look to the contracts, not California water law").

### Likelihood of Success on the Merits

#### Plaintiffs' Grounds for Relief

Plaintiffs argue that the Ninth Circuit raised questions as to the Bureau's preferential method of allocating CVP water to the Exchange Contractors. Plaintiffs contend that "equitable apportionment" is the proper method of allocation under both article 11(a) of the Westlands contract and article 7(b) of the San Benito contract. Article 11 of the Westlands contract states as follows:

(a) .... In any year in which there may occur a shortage from any cause, *the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water* from the San Luis Unit in accordance with conclusive determinations of the Contracting Officer as follows:

(i) A determination shall be made of the *total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit,* the quantity so determined being hereinafter referred to as the contractual commitments;

ii) A determination shall be made of *the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments,* the quantity so determined being hereinafter referred to as the available supply;

iii) The *total quantity of water agreed to be accepted by the District during the respective year,* under Article 3 hereof, *shall be divided by the contractual commitments,* the quotient thus obtained being hereinafter referred to as the District's contractual entitlements; and

iv) The *available supply shall be multiplied by the District's contractual entitlement* and the result shall be the quantity of water required to be delivered by the United States to the District for the respective year ...

(emphasis added). Article 7(b) of the San Benito Contract provides:

In any year that the Contracting Officer determines there is a shortage in the quantity of water available to customers of the United States from the Project, *the Contracting Officer will apportion available water among the water users capable of receiving water from the same Project facilities by reducing deliveries to all such water users by the same percentage,* unless he is prohibited by existing contracts, Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship. In the event reduced deliveries within the Division are necessary, the water supplies for both M & I and agricultural use shall be reduced by the same percentage for each contractor.

Alternatively, plaintiffs argue that, if the Bureau wanted to fulfill both the Exchange Contractors' full contractual supply and provide plaintiffs with water according to the formula described in plaintiffs' water con-

tracts, the Exchange Contractors' full share may be available from Millerton Lake through either releases or water transfers, as water contracts for districts within both the Friant and Delta–Mendota service areas are expressly subject to the Exchange Contractors' rights.

Plaintiffs argue that the Bureau is obligated to apportion water among the Exchange Contractors from other CVP sources to meet the contractual obligations for apportionment in the Westlands and San Benito contracts. Plaintiffs argue that the Westlands and San Benito contracts do not contain a provision which subordinates their rights to the Exchange Contractors.

### Analysis

In *Westlands*, the Ninth Circuit raised questions about this court's conclusions reached on the pleadings alone, and the interpretation of certain phrases within plaintiffs' water service contracts. The Ninth Circuit did not have before it the CVP contract history giving rise to the rights claimed by the parties before the Court. Nor did the appeals court address whether the Bureau's 1994 allocation decisions were appropriate, under the apportionment provisions in the Westlands and San Benito contracts. The Ninth Circuit neither analyzed, nor resolved, all contractual interpretation issues involved. Unlike the earlier motion decided solely on the pleadings, evidence has now been presented both in support and opposition to the motion.

Paragraph 31 of the Westland's contract authorizes challenges to the Bureau's actions under an arbitrary and capricious standard:

Where the terms of this contract provide for matters being done to the satisfaction of either party hereto, or *for action to be based upon the opinion or conclusive determination of such representative of either party hereto,* such terms are not intended to be and shall never be construed as permitting such satisfaction, opinion or determination of such a representative of either party to this contract to be *arbi-*

*trary, capricious or unreasonable;* and the District, notwithstanding any other provisions of the contract, *expressly reserves the right to relief from and appropriate adjustment for any such arbitrary, capricious or unreasonable satisfaction, opinion or determination.*

(emphasis added). Similarly, San Benito's contract states, at ¶ 32: [7]

Where the terms of the contract provide for actions to be *based upon the opinion or determination of either party to this contract,* said term shall not be construed as permitting such action to be predicated upon *arbitrary, capricious, or unreasonable opinions or determination, whether or not stated to be conclusive.*

Under these provisions, the Bureau's actions would not constitute a breach of contract unless "arbitrary, capricious, or unreasonable." *Cf., Westlands,* 10 F.3d at 675 & n. 4 (noting deferential standard in favor of Bureau). Plaintiffs' proposed injunction asks the court to order the Bureau to act affirmatively to apportion water between the San Luis and Exchange contractors. This type of injunction is mandatory, requiring action beyond maintenance of the status quo pende lite. Taken together, plaintiffs must establish not only the possibility that the Bureau acted arbitrarily, capriciously, or unreasonably, but also that the facts and law are clearly in their favor. *Committee of Central American Refugees,* 795 F.2d at 1441.

Federal law controls the interpretation of a contract where the United States is a party. *United States v. Seckinger,* 397 U.S. 203, 209, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1032 (9th Cir.1989). Although traditionally, an implementing agency is granted deference in its interpretation of statutes and regulations, where the rights at issue arise under contract the rule of agency deference is inapplicable. *Clay Tower Apartments v. Kemp,* 978 F.2d 478, 480 (9th Cir.1992). Ambiguous provisions are construed against the drafter, even if the

---

**7.** San Benito has an additional burden in seeking relief. Article 32 of its contract requires, "[i]f the Contractor questions any determination made by the Contracting officer," that the Secre- tary make findings of fact after consultation with the Contractor. The record does not demonstrate whether this procedure has been followed.

drafter is the government. *Kennewick,* 880 F.2d at 1033, *citing, Seckinger,* 397 U.S. at 209–10, 90 S.Ct. at 884–85. In addition, "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." *Peterson v. United States Dept. of the Interior,* 899 F.2d 799, 807 (9th Cir.), *cert. denied* 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990), *citing, F.H.A. v. The Darlington, Inc.,* 358 U.S. 84, 87–88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958). The Westlands and San Benito contracts were authorized by Reclamation law, 43 U.S.C. §§ 371 *et seq.*

Article 11(a) of the Westlands contract reserves to the United States "the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit." Similarly, the San Benito contract requires the Bureau to apportion "available water." Defendants argue that the Exchange Contractors' rights are not included in the "available water supply" or "available water" within the meaning of the Westlands and San Benito contracts.

Article 11(a)(ii) of the Westlands contract defines "available water" as:

> ... the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments
> ...

(emphasis added).[8] Plaintiffs argue that nothing in either the Westlands or San Benito contracts gives the Exchange Contractors a priority to San Luis Reservoir water. But this argument ignores that a fundamental premise underlying CVP design and operation is a historical contractual priority in favor of the Exchange Contractors. According to documents submitted, the San Luis contractors, such as Westlands and San Benito, were intended to receive only surplus Delta water, that is, the "available water" after existing CVP obligations, such as the Exchange Contractors' priority, were satisfied.

In 1949, the Bureau of Reclamation published a document examining the feasibility of future CVP projects, titled "A Comprehensive Departmental Report on the Development of the Water and Related Resources of the Central Valley Basin" ("Feasibility Report"). This document was transmitted to Congress prior to the passage of the Act.[9] Before the San Luis Reservoir was built, winter and spring continued to bring more than sufficient water to the Central Valley, despite existing water users' needs. Because supply exceeded demand, each year millions of gallons of usable water wasted into the Pacific. The Feasibility Report states that the San Luis Reservoir was designed to hold this additional water, to increase the irrigability of dry lands on the west side of the San Joaquin. *See also,* H.R.Rep. No. 399, 86th Cong. 2d Sess. (1960) ("The operation of the federal San Luis Unit would conserve and regulate *surplus wintertime water now wasting into the Pacific Ocean through the Golden Gate and make it usable, along with additional Central Valley Project Water from storage,* in the water-deficient San Joaquin Valley to the south") (emphasis added). As originally conceived,

> ... water for the west side upper San Joaquin Valley would be imported from Sacramento and lower San Joaquin Valleys via the Delta–Mendota Canal, Folsom–Newman, and Folsom–Ione–Mendota canals. Under initial development, it is contemplated that only the Delta–Mendota canal, which is authorized for construction under the Central Valley project, would be needed to provide a supplemental supply for presently irrigated lands and provide water for a considerable expansion in irrigated area. Water pumped into Delta–

---

**8.** The San Benito contract does not define the term "available water." When viewing the operations of the CVP as a whole, the circumstances under which the San Benito contract was executed, and the subsequent conduct of the parties, the term "available supply" can only be read to have the same meaning in the San Benito contract as does "available water supply" in the Westlands' contract.

**9.** For this reason, in *Westlands,* 10 F.3d at 672, the Ninth Circuit recognized that the Feasibility Report was of "some importance" in interpreting the San Luis Act.

Mendota canal would be relifted into San Luis Reservoir.... *Pumping to the reservoir under initial development or in dry periods under ultimate development would be chiefly from surplus winter and spring flows from the Sacramento River.*

Feasibility Report, at 129–30 (emphasis added). Since the inception of the San Luis Unit, a priority for the Exchange Contractors had been contemplated. San Luis Reservoir water, the source of water supply for the San Luis contractors, was intended to be:

... secured almost entirely by pumping through the Delta–Mendota canal *at such times as the full capacity of the canal is not required for initial Central Valley project needs.*

Feasibility Report, at 220 (emphasis added); *see also,* at 104, ("Water rights for existing irrigation developments are superior to any which may accrue to new developments"), *quoted in, Rank v. Krug,* 90 F.Supp. 773, 797 (S.D.Cal. (N.D.) 1950).

Although plaintiffs assert that no such "priority" appears in Westlands' or San Benito's contract, that concept is incorporated in the terms "available water supply" and "available water." This intent is echoed in the preamble to the Westlands contract, which states at page 3:

WHEREAS, investigations of the stream flow in the Sacramento River, the Trinity River, the American River, the San Joaquin River, and their tributaries indicate *that there will be available for furnishing to the District from the San Luis Unit an additional water supply* for surface diversion and direct application for irrigation and directly or indirectly to replenish depleted ground water underlying the District; ...

(emphasis added). This background leads to the only reasonable interpretation of the term "available water" in the Westlands and San Benito contracts is not "all water available from the San Luis Unit," as plaintiffs assert, but "all water available after previous commitments have been met."

More recent Congressional discussion surrounding enactment of the Central Valley Project Improvement Act, public law, 102–575, 106 stat. 4600, recognizes the superior rights held by the Exchange Contractors, and the unavailability of CVP water for apportionment in dry years:

A very significant change is how dry year shortages are dealt with. The House had suggested that the 800,000 acre-feet and the wildlife refuge water be subject to reduction only when shortages are imposed on *prior right and exchange right holders.* Aside from the implicit taking, since those rights are secured under State law and are superior to any CVP right, that provision would have never worked in practice.

During the current drought, prior right and exchange right holders agreed to forgo certain deliveries in order to permit the Secretary to make deliveries to the wildlife refuges and to urban users. *No reductions were imposed on them since no reductions could be imposed so long as there was any water.*

138 Cong.Rec. S17658, 17660 (Sept. 30, 1992) (statement of Sen. Wallop) (emphasis added).

The Westlands contract defines "available water" as water "available for meeting the contractual commitments." Article 11b. "Contractual commitments" are defined as:

... the total quantity of water agreed to be accepted during the respective year *under all contracts then in force* for the delivery of Central Valley Project water by the United States from the San Luis Unit ...

(emphasis added). Reclamation law defines a "contract" as:

... any repayment or water service contract between the United States and a district providing for the payment of construction charges to the United States including normal operation, maintenance, and replacement costs pursuant to Federal Reclamation law.

43 U.S.C. § 390bb(1). Under Reclamation law, the Secretary is authorized to "include a reasonable construction component in the rates set out in any long-term contract...." 43 U.S.C. § 485h–1(6); *see also* 43 U.S.C. §§ 485h(d) & (e). Under these provisions, water district contracts contain repayment obligations. *See, e.g.,* Westlands contract, at

¶ 6; San Benito contract, at ¶ 11. In contrast, the Exchange Contract contains no repayment provision, and does not list any "price" for the "sale" of irrigation water to the Exchange Contractors. The consideration for delivery of CVP water was an exchange of existing riparian rights, to enable the expansion of the CVP. Because the Exchange Contract lacks any provision "for the payment of construction charges to the United States including normal operation, maintenance, and replacement costs pursuant to Federal Reclamation law," the Exchange Contract is not part of the "contractual commitments," nor a "contract[ ] then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit," as described by the Westlands contract. *See, Peterson*, 899 F.2d at 807 (contracts must be read in light of enabling legislation). Under that same reasoning, the Exchange Contract is outside of the terms "under *all contracts then in force* for the delivery of Central Valley Project water by the United States from the San Luis Unit" under Section 11(a)(i) of the Westlands contract and prior right.

The 1967 Second Amendatory Contract for Exchange of Waters states in the recitations:

WHEREAS, it was however recognized in said Purchase Contract dated July 27, 1939, that the Contracting Entities were entitled to use beneficially certain other waters of the San Joaquin ... and,

WHEREAS, under said Exchange Contract since approximately July 16, 1951, the United States has been and is storing and diverting said reserved waters of the San Joaquin River for use within and without the watershed of said river by others than the Contracting Entities, and has been and is supplying the Contracting Entities in lieu of such waters with substitute water from the Sacramento River, the Sac-

ramento–San Joaquin Delta and other sources through the Delta–Mendota Canal of said Project and by other means....

Article 4(a) of the 1967 Exchange Contract recognize that this history provides the Exchange Contractors with a priority:

The United States may hereafter, either whole or in part, store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than the Contracting Entities *so long as, and only so long as, the United States does deliver to the Contracting Entities by means of the Project or otherwise substitute water in conformity with this contract.*

(emphasis added). The Exchange Contractors continue to hold riparian rights necessary to the CVP's inclusion of the Friant users.[10] In return for their riparian rights, the Exchange Contractors agreed in the Exchange and Purchase contracts to accept substitute water, primarily from the Sacramento River. 1967 Amendatory Exchange Contract, Article 5. The Exchange Contract does not contemplate the same type of supply and repayment that other water districts have, as described in 43 U.S.C. § 390bb(1).[11]

The San Benito contract provides that apportionment begins when the United States determines that "there is a shortage in the quantity of water available to customers of the United States." "Customer" is not defined in the San Benito contract. Generally, a "customer" is a "buyer, purchaser, consumer or patron," or "one that purchases usually systematically or frequently a commodity or service." Black's Law Dictionary, at 386 (6th ed.1990); Webster's New Collegiate Dictionary, at 278 (1981). Other water contractors purchase water on a yearly basis; they are

---

10. At article 16, the Exchange Contract states: This contract shall never be construed as a conveyance, abandonment or waiver of any water right or right to the use of water of the Contracting Entities ...

11. The remedy in the event of a permanent failure of supply further supports the view that the Exchange Contract is more than a repayment contract. In those circumstances, the United States agreed that:

... the Contracting Entities shall receive the said reserved waters of the San Joaquin River as specified in said Purchase Contract and the United States hereby agrees to release at all such times said reserved waters at Friant Dam. Article 4(c), 1967 Exchange Contract. Because the Exchange Contract provides a reversion to the Exchange Contractors of their original riparian rights, it is distinguishable from a repayment contract, within the meaning of § 390bb(3)(C)(i).

clearly "customers of the United States." The Exchange Contractors' position is far less clear. Viewing the transactions in context, it is not arbitrary and capricious for the Bureau to interpret San Benito's contract to exclude the Exchange Contractors from the category "customers of the United States." The Exchange Contract contains no purchase provision, nor is exchange of water defined as a "contract" under Reclamation law. Because they provide water to enable the Friant Division to operate, the Exchange Contractors are appropriately found to be "suppliers" of water, rather than "customers of the United States."

In determining the meaning of a contract, the parties conduct subsequent to its formation is entitled to "great weight." *Arizona Laborers, Teamsters and Cement Masons v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir.1985). Although water shortages caused reductions in water deliveries by the Bureau in 1977 and 1990 through 1993, those shortages were never apportioned among the Exchange Contractors. Exhibit 22, at ¶8 (Declaration of Richard Moss). Westlands did not protest the lack of apportionment until the 1992 litigation, almost fifteen years after the initial shortage occurred.

Additionally, in operating the CVP, the Bureau has viewed the Exchange Contractor's rights as superior to those of other contractors. In October, 1992, the Bureau published a document titled "Long Term Central Valley Project Operations Criteria and Plan" ("OCAP"). Exhibit 1. Although not determinative of the meaning the Westlands contract, one statement bears on the conduct of the parties subsequent to the contract's execution, and is therefore entitled to "great weight":

> Water demands for the [Delta Mendota Canal] and San Luis Unit are primarily composed of two separate types—CVP water service contractors and exchange contractors. *A significantly different rela-*

tionship exists between Reclamation and these two groups. Exchange contractors "exchanged" their senior water rights to water in the San Joaquin River for a CVP water supply from the Delta. Reclamation thus guaranteed the exchange contractors a firm water supply of 840,000 acre-feet per anum, with a maximum reduction in water-short years of 25 percent. Conversely, water service contractors did not have water rights to "exchange." Water service contractors also receive their supply from the Delta, but their supplies are subject to reductions that can exceed 25 percent.

Exhibit 1, at p. 62; *see also*, 1967 Exchange Contract, Article 8 (maximum reduction in critically dry years is three-quarters of maximum contractual supply). The OCAP demonstrates the Bureau does not consider the San Luis Reservoir as a source to be apportioned among all entities in critically dry years. The Bureau recognizes the Exchange Contractors, as senior water rights holders, with superior rights to water service contractors. Pro rata apportionment, as sought by plaintiffs, is conceptually inconsistent with the Exchange Contractor's superior rights.[12]

Analysis of the results that would occur if plaintiffs' arguments were accepted demonstrates that plaintiffs' interpretation is not reasonable. In the event of a temporary shortage of water, the Exchange Contract provides, at Article 4(b), that after the first seven days, "the United States shall make up such quantities by releases of available storage from Millerton Lake" to minimum storage capacity. Taking water from Millerton to meet the Exchange Contractors would directly impact the Friant contractors, who depend on Millerton as a primary source of supply.[13] Yet all twenty-seven Friant water districts' contracts contain a provision reading:

> The rights of the District under this contract are subject to the terms of the Con-

---

**12.** Although amended in 1967—after the 1963 Westlands contract was executed—the Exchange Contract contains no apportionment formula.

**13.** Rather than regularly obtaining water from Millerton, the Exchange Contract provides at article 5(a):

It is anticipated that most if not all of the substitute water provided the Contracting Entities hereunder will be delivered to them via the aforementioned Delta–Mendota Canal.

tract for Exchange of waters dated July 27, 1939, between the United States and the San Joaquin and Kings River Canal and Irrigation Company, incorporated and others ... *the United States agrees that it will not deliver to the Contracting Entities thereunder waters of the San Joaquin River unless and until required by the terms of said contract so to do* and the United States further agrees that *it will not voluntarily and knowingly render itself unable to deliver to the parties entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries of the Sacramento–San Joaquin Delta* those quantities required to satisfy the obligations of the United States under said Exchange Contract and under Schedule 2 of the Contract for the Purchase of Miller and Lux Water Rights.

*See also,* Exhibit 34, at ¶ 5. In 1959, when the San Luis expansion was contemplated by the Bureau, the Friant contractors had threatened that, unless such a provision existed in their contracts to protect the Exchange Contractors' priority, they would oppose the Bureau's place of use permit application before the California State Water Resources Control Board. A letter dated October 31, 1959, from Mr. Robert E. Moock, who represented the Friant Districts, states:

> I told the group [in a conference with the Bureau of Reclamation] that the Friant–Kern area would not go for this expansion of place of use unless the United States recognized a preference for the exchange contract and that water necessary to serve the present service areas of the Contra Costa Canal.... To my surprise, my suggestion was somewhat favorably received, and it appears to me that the time is ripe for the procurement of a commitment from the Bureau of Reclamation for the preferential treatment of the exchange contract which we have been seeking....

*See,* attachments to Declaration of Denslow Green (March 25, 1994). Other letters submitted confirm this effort. *See,* attachments to Stipulation (April 8, 1994) (November 19, 1959, letter of Adolf Moskovitz: "I believe this is an excellent opportunity for the Friant water users to obtain binding contractual assurances of the preferential status of the exchange contract"). According to a memorandum of understanding drafted by Thomas Clarke, the Solicitor for the Bureau, on December 29, 1959, just prior to the authorization and construction of the San Luis Unit, the Bureau assured the Friant contractors that their source of water supply would not be impacted by the delivery of water to San Luis contractors, stating:

> ... I confirm to you that it has been, is and will continue to be the policy and practice of the United States to utilize the water available.... from the Sacramento River and its tributaries and the Sacramento–San Joaquin Delta to first satisfy the requirements of the Exchange Contract and Schedule 2 of the Purchase Contract so long as it is legally and reasonably physically possible to satisfy these requirements; provided that the United States has not, and will not voluntarily impair the delivery of water required to satisfy those requirements.

The final result of these negotiations are the amendments to the Friant contracts, quoted above. The Westlands and San Benito contracts were executed after the Friant amendments. To interpret the Westlands and San Benito contracts to deprive the Friant contractors of their prior rights to CVP water to all twenty-seven Friant contracts, contravenes the Bureau's entire course of conduct in developing the San Luis Unit and is unreasonable.

Obligations specified in the Friant contracts also weighs against a finding of arbitrary, capricious or unreasonable government conduct in failing to apportion under the San Benito contract, which excludes any obligation to apportion when "prohibited by existing contracts," here, the Friant contracts. The amended Friant contracts obligate the Bureau to refrain from "voluntarily and knowingly render[ing] itself unable to deliver to the parties entitled thereto" substitute water from the Delta to satisfy the Exchange Contractors' rights. "Equitable apportionment" in dry years would render the Bureau unable to satisfy the Exchange Contractors' rights from the Delta. For example, in critically dry 1994, the evidence indicates the San

Luis Reservoir contains insufficient water to satisfy both the apportionment provision in the Westlands and San Benito contracts and the Exchange Contractor's needs. Exhibit 34, at ¶ 8. As a consequence, releases from Millerton would be required to satisfy the Exchange Contract, such that the Friant contractors would receive nothing for the 1994 water year. *Id.* at ¶¶ 8, 9. The Bureau did not act arbitrarily, capriciously, or unreasonably by failing to apportion water under the San Benito contract, when to do so would result in allocating no water during the 1994 summer months to satisfy the prior rights of twenty-seven Friant contracts.

Apportionment in 1994, in effect, "would force the abandonment of this portion of the project which has not only been fully authorized by Congress but paid for through its continuing appropriations. Apportionment would prevent fulfillment of the contracts made by the United States with the [Friant] Water and Utility Districts..." *Dugan v. Rank,* 372 U.S. 609, 621, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963). That all Friant contracts foresaw and were designed to prevent the conditions sought to be imposed by plaintiffs, completely contradicts plaintiffs' asserted interpretation. Millerton Lake is not a readily available alternative water source to the Exchange Contractors.

Apportioning water with the San Luis contractors each shortage year ignores the substance of the Exchange Contractors' riparian rights, and could result in periodic takings under the just compensation clause. *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 734, 70 S.Ct. 955, 960–61, 94 L.Ed. 1231 (1950), recognizes that Congress intended Reclamation law to be carried out respecting rights vested under state law, such as the vested riparian interests held by the Exchange Contractors:

> We cannot disagree with claimants' contention that in undertaking these Friant projects and implementing the work as car-

ried forward by the Reclamation Bureau, Congress proceeded on a basis of full recognition of [existing] water rights having valid existence under state law ... We think this amounts, not to authorizations and declarations creating causes of action against the United States, but to awareness and approval of administrative construction. We think it clear that throughout the conception, enactment, and subsequent administration of the plan, Congress has recognized the property status of water rights vested under California law.

Section 8 of the 1902 act requires the Bureau to "defer to the substance, as well as the form, of state water law." *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 3001, 57 L.Ed.2d 1018 (1978); 43 U.S.C. § 383. "[T]he President has approved and the Congress has confirmed the commitment by the United States to the obligation to replace the waters of the San Joaquin River with waters from the Sacramento River." *Wolfsen v. United States,* 162 F.Supp. 403, 407–08 (Cl.Ct.1958), *cert. denied,* 358 U.S. 907, 79 S.Ct. 233, 3 L.Ed.2d 228 (1958) (noting California legislature's intent that "no right to the use of water shall be gained or lost by reason of any exchange thereof"): [14]

> The diversion of San Joaquin waters was authorized only because of the commitment to substitute water from the Sacramento River. We do not believe that the United States could, with impunity, take away the substituted waters.

*Wolfsen,* 162 F.Supp. at 406. Plaintiffs' reading of the Westlands and San Benito contracts would mean that the Bureau obligated itself to Westlands and San Benito, under provisions that could require just compensation to the Exchange Contractors each shortage year. That interpretation is not reasonable.

Plaintiffs have not shown the law and facts clearly favor their contention that the Bureau acted arbitrarily, capriciously or unreason-

---

**14.** Although plaintiffs have not grounded their present motion on state law, *Wolfsen* indicates that such a challenge would not be successful. Although the Ninth Circuit stated without analysis that it was "not convinced that the Exchange contractors, prior appropriators of water from one river, have superior water rights (i.e. vested

property rights) to water from a different source," *Westlands,* 10 F.3d at 676, *Wolfsen* indicates that such a distinction is a "legal technicality" that does not interfere with the Exchange Contractors' substantive rights. *Id.,* 162 F.Supp. at 406.

ably this critically dry year in failing to apportion water with the Exchange Contractors. As a matter of contractual interpretation, the Exchange Contractors' share does not fit within the definition of "available water" or "available water supply," nor are the Exchange Contractors among those entities having a "contract for water delivery from the San Luis Unit," as that term is used in the Westlands contract, or a "customer," as that term is used in the San Benito contract. Apportionment is not required. Taking plaintiffs' contracts in the context in which they were executed, and read in light of Reclamation law, plaintiffs' asserted interpretations are unreasonable and violate fifty years of water contracting history.

Plaintiffs assert the Bureau's inability to satisfy the Exchange Contractors' needs has become "permanent" within the meaning of the Exchange Contract, and that the Exchange Contractors are only entitled to the natural inflow to Millerton, not to water stored in Millerton. In support, plaintiffs submit a letter dated October 23, 1993, from the Bureau's Regional Financial Manager, written to Jason Peltier, Manager of the Central Valley Project Water Association. The Peltier letter states that San Luis contractors and other named contractors are likely to receive the reduced amounts of water over the next several years, at least until the year 2026. Part of plaintiffs' argument rests on the contention that the Exchange Contractors are "contractors" within the meaning of the Reclamation act. For the reasons stated in this memorandum, that argument is rejected. The Peltier letter does not establish that the Exchange Contractors will suffer a "permanent" reduction. The letter states that "all other contractors" should receive a 100% supply. This anticipates a full supply, not a permanent reduction, in the Exchange Contractors' needs.

Plaintiffs have not shown that the law and facts clearly establish that they are likely to prevail on the merits of their claims.

**Balance of Hardships/Irreparable Injury**

Even if the facts and law clearly favored plaintiffs, preliminary injunctive relief could not be granted based on the balance of hardships. Plaintiffs argue that they will suffer irreparable injury if relief is not granted. According to Steven Ottemoeller, Westlands' Chief of Operations, if preliminary relief is not granted: 1) the District will be harmed by decreased revenues, resulting in deferred maintenance and possible jeopardy of District operations; 2) groundwater pumping will become necessary, causing subsidence, overdrafting of groundwater basins and decreased groundwater quality; 3) increased fallow acreage causing dust emissions; 4) increased soil degradation due to poor-quality groundwater; and 5) increased unemployment. Exhibit 10, at ¶¶ 9–14. Plaintiffs also argue that no adequate remedy at law exists, because their contracts do not provide for monetary relief in the event of a breach by the United States. The declaration of David Orth demonstrates that financial difficulties arising from capital expenditures and maintenance, and other adverse impacts on Westlands' financial condition, will result if preliminary injunctive relief is withheld. Exhibit 53, at ¶ 7. Agricultural water users within Westlands will also suffer harm if preliminary relief is not granted. Exhibit 54.

Defendant-intervenors have submitted considerable evidence of greater hardship that injunctive relief would cause. If Friant Division releases from Millerton Lake are compelled to meet the needs of the Exchange Contractors, water would have to be transported along the dry and porous San Joaquin River bed to reach Mendota Pool. Taking into account an estimated seepage loss of forty percent that would occur en route, the required release from Millerton is 443,000 acre-feet. Currently, only 480,000 acre-feet of water is forecasted to be available to meet the Friant user's needs—which would reduce each Friant user's share to less than five percent of normal. The Bureau of Reclamation calculates that the Friant contractors might receive no water at all. Exhibit 34, at ¶¶ 8, 9. The hardship to the Friant contractors, and those who depend upon them, who predominantly farm permanent crops, as contrasted with row crops farmed by plaintiffs' members, would be devastating.

The Federal Defendants have also submitted evidence showing an adverse impact on Southern California Edison Company's hy-

droelectric power generation facilities, which are upstream of Millerton. Exhibit 34, at ¶ 11. If San Joaquin River water is diverted back to the Exchange Contractors, Southern California Edison must revise its water release patterns. *Id.*

Plaintiffs discount the possibility of water loss during conveyance, proposing that the transfer could be accomplished through a "trade" for state water resources. Plaintiffs argue that the Bureau could exchange Friant Division water for state-owned water currently in the San Luis Reservoir. The state-owned water could then be released to plaintiff districts. Plaintiffs suggest that the Bureau could provide water from outside sources: For example, the Yuba County Water Agency, Placer County Water Agency, and Sacramento River Water Right Exchange Contractors have all expressed a willingness to transfer water. Although any such transfer is subject to approval by the State Water Resources Control Board ("SWRCB"). Plaintiffs argue it is reasonable to assume SWRCB approval would be forthcoming.

Federal Defendants have submitted evidence that plaintiffs' proposed transfers are problematic due to legal and practical constraints. According to Lowell Ploss, Chief of CVP Power Operations:

1) No legal authority exists to mandate such transfers;

2) If legal authority did exist, there are no appropriated funds to permit acquisitions from the state;

3) There is no guarantee the Bureau could acquire the water in the amounts and time frame required to resolve the present dispute, due to other demands for CVP water;

4) Agreement with other agencies [15] is necessary, and has not been obtained.

Exhibit 63, at ¶ 3. Water transfers are not a viable solution for an additional reason. Transfers are contingent on state approval. Because agencies necessary to securing approval for water transfers have not been joined as parties, ordering relief requiring water transfers would be ineffective. No jurisdiction exists to order the non-party state entities to authorize such transfers.

According to Harvey Williams, Secretary–Manager of the Shafter–Wasco Irrigation District, farmers without groundwater wells in that district would lose over $23 million in crops. Declaration of Harvey Williams, at ¶ 6a (Mar. 24, 1994). If permanent crops are not supplied with a minimum amount of water, they may have to be destroyed, resulting in a $19.8 million loss. *Id.* The cost to replant permanent crops is over $15 million. *Id.* For farmers with groundwater wells, Williams estimates that increased pumping costs and reduction in groundwater supplies will occur, resulting in an additional costs of over $20,000. *Id.* at ¶ 6b.

The Friant Power Authority states that its principle source of power generation is dependant on releases from the Friant Reservoir, to the outlets of the Madera and Friant–Kern Canals. Declaration of John E. Boudreau, Manager of Friant Power Authority, at ¶ 7 (March 24, 1994). Releases to Westlands or San Benito would not, as the system is presently configured, pass through either of these canals. If relief is granted, the Power Authority would be unable to generate any significant amount of power at Friant. The Power Authority was financed with a $40 million bond, which was previously in default due to drought conditions. *Id.* at ¶ 6. Although the bond is currently in good standing because 1992 was a wet year, granting the relief requested by plaintiffs:

... would place the project in a hole from which it may never recover. Any hope of refinancing the project would be lost.

*Id.* at 10.

James C. Chandler, manager of the Orange Cove Irrigation District, which is dependent on the Friant district for its water supply, estimates that granting the preliminary injunction would result in lost revenues and costs to farmers in that district, including effects that would be suffered over the next five years, at over $500,000,000. Exhibit 24, at ¶ 9. The failure to produce crops during the 1994 year alone would result in

**15.** These are: 1) The California Department of Fish and Game; 2) U.S. Fish & Wildlife Service; 2) National Marine Fisheries Service; 4) California Department of Water Resources. Exhibit 63, at ¶ 3(d).

$92,200,000 of that figure. *Id.* John Boudreau, manager of the Terra Bella Irrigation District anticipates that a preliminary injunction would result in an estimated $177,000,000.00 loss, to be suffered over the next five years.

The Exchange Contractors' water share is based on the run of the Sacramento River, rather than a yearly acre-feet allocation. Consequently, the Exchange Contractors must use water within certain calendar months. According to the schedule in the Exchange Contract, if the requested relief is granted, the Exchange Contractors will be entitled to 381,000 acre-feet from April through October, 1994. During the summer months, it is anticipated that both Millerton and the San Joaquin River will be at minimum capacity, and insufficient water will be available to irrigate the Exchange Contractors' land.[16] *Id.* at ¶ 10. Because of the history of the Exchange Contractors continued supply of water, which has continued without reduction below 75% over the past several decades, permanent plantings and crops vulnerable to dry weather exist throughout the Exchange Contractors' lands. *Id.* at 6. Because these permanent plantings would be lost, and other crops unable to survive the lack of irrigation, the Exchange Contractors estimate that the resulting loss will be $130 million. *Id.* at 19.

Despite the recitation of dollar losses above, the balance of hardships is not explained by numbers alone. An injunction which would result in five-to-zero percent releases to the Friant contractors would have a devastating effect on water users, employees and communities within the affected districts. The intangible effects that flow from the enumerated economic consequences would, in the words of Mr. Boudreau, "threaten the very existence of the [districts] and the community." Exhibit 25, at ¶ 5. In addition, preliminary injunctive relief would have potential long-term effects on debt repayment and the availability of continued financing. The potential harm to others dependant on the present system outweighs potential benefit that would accrue to plaintiffs.

Because plaintiffs have not shown that the balance of hardships tips in their favor, preliminary injunctive relief is not warranted.

**Public Interest**

The public interest must be considered where the public may be affected by injunctive relief. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 967 (9th Cir. 1983).

An increasingly scarce water supply must be spread yet thinner in this critically dry year. After considering all the evidence submitted, it is apparent that the effect of granting relief will cause greater harm than to leave the allocations determined by the Bureau. The court cannot manage the CVP. To the contrary, the law requires deference to the expertise and experience of the Bureau as water manager of the CVP. Defendants have submitted considerable evidence that the effects of granting injunctive relief would create extreme hardship. Although plaintiffs would derive some benefit from relief, they have failed to establish a legal entitlement to the water they seek. Granting relief in these circumstances is against the public interest.

**CONCLUSION**

After reviewing the papers filed both in support of and opposition to the motion, considering the evidence and arguments of counsel presented at the hearing on the motion, and for the reasons stated in open court and in this memorandum decision:

1) Plaintiffs have not demonstrated that the law and facts entitle them to "equitable apportionment" with the Exchange Contractors, based on a reading of the respective contracts and related material;

---

**16.** For temporary interruptions of service, the Exchange Contract provides:

... that the United States in no event be required to draw the storage in Millerton Lake below Elevation 464.00 U.S.G.S. datum or to retain water in storage in Millerton Lake in anticipation of future need for such releases. According to the Exchange Contractors, 1994 is anticipated to be the fourth driest year on record.

2) Even if such a showing could be made, plaintiffs have not shown that the balance of hardships tips in their favor, given the devastating effect that injunctive relief would have on defendants;

3) The public interest does not favor granting the relief sought. Although plaintiffs would derive some benefit from preliminary relief, the communities in the Friant division would be severely and disproportionately impacted. The Exchange Contractors would also be severely impacted. In addition, plaintiffs have not shown that the Bureau has breached any legal obligation to apportion water to plaintiffs from entitlements due with the Exchange Contractors;

Plaintiffs' motion for a preliminary injunction is DENIED.

SO ORDERED.

DATED: August 22, 1994.

dwan2/preinj.94